ASHCROFT, ATTORNEY GENERAL, ET AL. *v.*
FREE SPEECH COALITION ET AL.

No. 00–795.   Argued October 30, 2001—Decided April 16, 2002

236

*Deputy Solicitor General Clement* argued the cause for petitioners. With him on the briefs were *Solicitor General Olson, Acting Solicitor General Underwood, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Irving L. Gornstein, Barbara L. Herwig,* and *Jacob M. Lewis.*

*H. Louis Sirkin* argued the cause for respondents. With him on the brief were *Laura A. Abrams* and *John P. Feldmeier.* \*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of New Jersey et al. by *John J. Farmer, Jr.,* Attorney General of New Jersey, and

JUSTICE KENNEDY delivered the opinion of the Court.

We consider in this case whether the Child Pornography Prevention Act of 1996 (CPPA), 18 U. S. C. § 2251 *et seq.,* abridges the freedom of speech. The CPPA extends the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children. The statute prohibits, in specific circumstances, possessing or distributing these images, which may be created by using adults who

---

*Patrick DeAlmeida* and *Carol Johnston,* Deputy Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Janet Napolitano* of Arizona, *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *James E. Ryan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Jennifer M. Granholm* of Michigan, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Patricia A. Madrid* of New Mexico, *Roy Cooper* of North Carolina, *Wayne Stenehjem* of North Dakota, *Herbert D. Soll* of the Northern Mariana Islands, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *John Cornyn* of Texas, *Mark L. Shurtleff* of Utah, *Mark L. Earley* of Virginia, *Christine O. Gregoire* of Washington, and *James E. Doyle* of Wisconsin; for the National Center for Missing & Exploited Children by *Dennis DeConcini* and *Susan M. Kalp;* for the National Law Center for Children and Families et al. by *J. Robert Flores, Bruce A. Taylor,* and *Janet M. LaRue;* for the National Legal Foundation by *Barry C. Hodge;* for Morality in Media, Inc., by *Robin S. Whitehead;* and for Senator Sam Brownback et al. by *Jay Alan Sekulow, Stuart J. Roth, James M. Henderson, Sr., David A. Cortman, Colby M. May, Walter M. Weber,* and *Benjamin W. Bull.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *William Bennett Turner, Ann E. Beeson,* and *Steven R. Shapiro;* for the Association of American Publishers, Inc., et al. by *R. Bruce Rich, Jonathan Bloom,* and *Michael A. Bamberger;* and for the Liberty Project by *Jodie L. Kelley* and *Daniel Mach.*

look like minors or by using computer imaging. The new technology, according to Congress, makes it possible to create realistic images of children who do not exist. See Congressional Findings, notes following 18 U. S. C. § 2251.

By prohibiting child pornography that does not depict an actual child, the statute goes beyond *New York* v. *Ferber*, 458 U. S. 747 (1982), which distinguished child pornography from other sexually explicit speech because of the State's interest in protecting the children exploited by the production process. See *id.*, at 758. As a general rule, pornography can be banned only if obscene, but under *Ferber*, pornography showing minors can be proscribed whether or not the images are obscene under the definition set forth in *Miller* v. *California*, 413 U. S. 15 (1973). *Ferber* recognized that "[t]he *Miller* standard, like all general definitions of what may be banned as obscene, does not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children." 458 U. S., at 761.

While we have not had occasion to consider the question, we may assume that the apparent age of persons engaged in sexual conduct is relevant to whether a depiction offends community standards. Pictures of young children engaged in certain acts might be obscene where similar depictions of adults, or perhaps even older adolescents, would not. The CPPA, however, is not directed at speech that is obscene; Congress has proscribed those materials through a separate statute. 18 U. S. C. §§ 1460–1466. Like the law in *Ferber*, the CPPA seeks to reach beyond obscenity, and it makes no attempt to conform to the *Miller* standard. For instance, the statute would reach visual depictions, such as movies, even if they have redeeming social value.

The principal question to be resolved, then, is whether the CPPA is constitutional where it proscribes a significant universe of speech that is neither obscene under *Miller* nor child pornography under *Ferber*.

I

Before 1996, Congress defined child pornography as the type of depictions at issue in *Ferber*, images made using actual minors. 18 U. S. C. § 2252 (1994 ed.). The CPPA retains that prohibition at 18 U. S. C. § 2256(8)(A) and adds three other prohibited categories of speech, of which the first, § 2256(8)(B), and the third, § 2256(8)(D), are at issue in this case. Section 2256(8)(B) prohibits "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture," that "is, or appears to be, of a minor engaging in sexually explicit conduct." The prohibition on "any visual depiction" does not depend at all on how the image is produced. The section captures a range of depictions, sometimes called "virtual child pornography," which include computer-generated images, as well as images produced by more traditional means. For instance, the literal terms of the statute embrace a Renaissance painting depicting a scene from classical mythology, a "picture" that "appears to be, of a minor engaging in sexually explicit conduct." The statute also prohibits Hollywood movies, filmed without any child actors, if a jury believes an actor "appears to be" a minor engaging in "actual or simulated . . . sexual intercourse." § 2256(2).

These images do not involve, let alone harm, any children in the production process; but Congress decided the materials threaten children in other, less direct, ways. Pedophiles might use the materials to encourage children to participate in sexual activity. "[A] child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children 'having fun' participating in such activity." Congressional Finding (3), notes following § 2251. Furthermore, pedophiles might "whet their own sexual appetites" with the pornographic images, "thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children." *Id.*, Find-

ings (4), (10)(B). Under these rationales, harm flows from the content of the images, not from the means of their production. In addition, Congress identified another problem created by computer-generated images: Their existence can make it harder to prosecute pornographers who do use real minors. See *id.*, Finding (6)(A). As imaging technology improves, Congress found, it becomes more difficult to prove that a particular picture was produced using actual children. To ensure that defendants possessing child pornography using real minors cannot evade prosecution, Congress extended the ban to virtual child pornography.

Section 2256(8)(C) prohibits a more common and lower tech means of creating virtual images, known as computer morphing. Rather than creating original images, pornographers can alter innocent pictures of real children so that the children appear to be engaged in sexual activity. Although morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber*. Respondents do not challenge this provision, and we do not consider it.

Respondents do challenge § 2256(8)(D). Like the text of the "appears to be" provision, the sweep of this provision is quite broad. Section 2256(8)(D) defines child pornography to include any sexually explicit image that was "advertised, promoted, presented, described, or distributed in such a manner that conveys the impression" it depicts "a minor engaging in sexually explicit conduct." One Committee Report identified the provision as directed at sexually explicit images pandered as child pornography. See S. Rep. No. 104–358, p. 22 (1996) ("This provision prevents child pornographers and pedophiles from exploiting prurient interests in child sexuality and sexual activity through the production or distribution of pornographic material which is intentionally pandered as child pornography"). The statute is not so limited in its reach, however, as it punishes even

those possessors who took no part in pandering. Once a work has been described as child pornography, the taint remains on the speech in the hands of subsequent possessors, making possession unlawful even though the content otherwise would not be objectionable.

Fearing that the CPPA threatened the activities of its members, respondent Free Speech Coalition and others challenged the statute in the United States District Court for the Northern District of California. The Coalition, a California trade association for the adult-entertainment industry, alleged that its members did not use minors in their sexually explicit works, but they believed some of these materials might fall within the CPPA's expanded definition of child pornography. The other respondents are Bold Type, Inc., the publisher of a book advocating the nudist lifestyle; Jim Gingerich, a painter of nudes; and Ron Raffaelli, a photographer specializing in erotic images. Respondents alleged that the "appears to be" and "conveys the impression" provisions are overbroad and vague, chilling them from producing works protected by the First Amendment. The District Court disagreed and granted summary judgment to the Government. The court dismissed the overbreadth claim because it was "highly unlikely" that any "adaptations of sexual works like 'Romeo and Juliet,' . . . will be treated as 'criminal contraband.'" App. to Pet. for Cert. 62a–63a.

The Court of Appeals for the Ninth Circuit reversed. See 198 F. 3d 1083 (1999). The court reasoned that the Government could not prohibit speech because of its tendency to persuade viewers to commit illegal acts. The court held the CPPA to be substantially overbroad because it bans materials that are neither obscene nor produced by the exploitation of real children as in *New York* v. *Ferber*, 458 U. S. 747 (1982). Judge Ferguson dissented on the ground that virtual images, like obscenity and real child pornography, should be treated as a category of speech unprotected by the First Amendment. 198 F. 3d, at 1097. The Court of Appeals voted to

deny the petition for rehearing en banc, over the dissent of three judges. See 220 F. 3d 1113 (2000).

While the Ninth Circuit found the CPPA invalid on its face, four other Courts of Appeals have sustained it. See *United States* v. *Fox*, 248 F. 3d 394 (CA5 2001); *United States* v. *Mento*, 231 F. 3d 912 (CA4 2000); *United States* v. *Acheson*, 195 F. 3d 645 (CA11 1999); *United States* v. *Hilton*, 167 F. 3d 61 (CA1), cert. denied, 528 U. S. 844 (1999). We granted certiorari. 531 U. S. 1124 (2001).

## II

The First Amendment commands, "Congress shall make no law . . . abridging the freedom of speech." The government may violate this mandate in many ways, *e. g.*, *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression. The CPPA's penalties are indeed severe. A first offender may be imprisoned for 15 years. § 2252A(b)(1). A repeat offender faces a prison sentence of not less than 5 years and not more than 30 years in prison. *Ibid.* While even minor punishments can chill protected speech, see *Wooley* v. *Maynard*, 430 U. S. 705 (1977), this case provides a textbook example of why we permit facial challenges to statutes that burden expression. With these severe penalties in force, few legitimate movie producers or book publishers, or few other speakers in any capacity, would risk distributing images in or near the uncertain reach of this law. The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere. Under this principle, the CPPA is unconstitutional on its face if it prohibits a substantial amount of protected expression. See *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612 (1973).

The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people. In

its legislative findings, Congress recognized that there are subcultures of persons who harbor illicit desires for children and commit criminal acts to gratify the impulses. See Congressional Findings, notes following § 2251; see also U. S. Dept. of Health and Human Services, Administration on Children, Youth and Families, Child Maltreatment 1999 (estimating that 93,000 children were victims of sexual abuse in 1999). Congress also found that surrounding the serious offenders are those who flirt with these impulses and trade pictures and written accounts of sexual activity with young children.

Congress may pass valid laws to protect children from abuse, and it has. *E. g.*, 18 U. S. C. §§ 2241, 2251. The prospect of crime, however, by itself does not justify laws suppressing protected speech. See *Kingsley Int'l Pictures Corp.* v. *Regents of Univ. of N. Y.*, 360 U. S. 684, 689 (1959) ("Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech" (internal quotation marks and citation omitted)). It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities. See *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 745 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it"); see also *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment'") (quoting *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989)); *Carey* v. *Population Services Int'l*, 431 U. S. 678, 701 (1977) ("[T]he fact that protected speech may be offensive to some does not justify its suppression").

As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear. The freedom of speech has its limits; it does not

embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children. See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 127 (1991) (KENNEDY, J., concurring). While these categories may be prohibited without violating the First Amendment, none of them includes the speech prohibited by the CPPA. In his dissent from the opinion of the Court of Appeals, Judge Ferguson recognized this to be the law and proposed that virtual child pornography should be regarded as an additional category of unprotected speech. See 198 F. 3d, at 1101. It would be necessary for us to take this step to uphold the statute.

As we have noted, the CPPA is much more than a supplement to the existing federal prohibition on obscenity. Under *Miller* v. *California*, 413 U. S. 15 (1973), the Government must prove that the work, taken as a whole, appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political, or scientific value. *Id.*, at 24. The CPPA, however, extends to images that appear to depict a minor engaging in sexually explicit activity without regard to the *Miller* requirements. The materials need not appeal to the prurient interest. Any depiction of sexually explicit activity, no matter how it is presented, is proscribed. The CPPA applies to a picture in a psychology manual, as well as a movie depicting the horrors of sexual abuse. It is not necessary, moreover, that the image be patently offensive. Pictures of what appear to be 17-year-olds engaging in sexually explicit activity do not in every case contravene community standards.

The CPPA prohibits speech despite its serious literary, artistic, political, or scientific value. The statute proscribes the visual depiction of an idea—that of teenagers engaging in sexual activity—that is a fact of modern society and has been a theme in art and literature throughout the ages.

Under the CPPA, images are prohibited so long as the persons appear to be under 18 years of age. 18 U. S. C. § 2256(1). This is higher than the legal age for marriage in many States, as well as the age at which persons may consent to sexual relations. See § 2243(a) (age of consent in the federal maritime and territorial jurisdiction is 16); U. S. National Survey of State Laws 384–388 (R. Leiter ed., 3d ed. 1999) (48 States permit 16-year-olds to marry with parental consent); W. Eskridge & N. Hunter, Sexuality, Gender, and the Law 1021–1022 (1997) (in 39 States and the District of Columbia, the age of consent is 16 or younger). It is, of course, undeniable that some youths engage in sexual activity before the legal age, either on their own inclination or because they are victims of sexual abuse.

Both themes—teenage sexual activity and the sexual abuse of children—have inspired countless literary works. William Shakespeare created the most famous pair of teenage lovers, one of whom is just 13 years of age. See Romeo and Juliet, act I, sc. 2, l. 9 ("She hath not seen the change of fourteen years"). In the drama, Shakespeare portrays the relationship as something splendid and innocent, but not juvenile. The work has inspired no less than 40 motion pictures, some of which suggest that the teenagers consummated their relationship. *E. g.*, Romeo and Juliet (B. Luhrmann director, 1996). Shakespeare may not have written sexually explicit scenes for the Elizabethan audience, but were modern directors to adopt a less conventional approach, that fact alone would not compel the conclusion that the work was obscene.

Contemporary movies pursue similar themes. Last year's Academy Awards featured the movie, Traffic, which was nominated for Best Picture. See Predictable and Less So, the Academy Award Contenders, N. Y. Times, Feb. 14, 2001, p. E11. The film portrays a teenager, identified as a 16-year-old, who becomes addicted to drugs. The viewer sees the degradation of her addiction, which in the end leads her

to a filthy room to trade sex for drugs. The year before, American Beauty won the Academy Award for Best Picture. See "American Beauty" Tops the Oscars, N. Y. Times, Mar. 27, 2000, p. E1. In the course of the movie, a teenage girl engages in sexual relations with her teenage boyfriend, and another yields herself to the gratification of a middle-aged man. The film also contains a scene where, although the movie audience understands the act is not taking place, one character believes he is watching a teenage boy performing a sexual act on an older man.

Our society, like other cultures, has empathy and enduring fascination with the lives and destinies of the young. Art and literature express the vital interest we all have in the formative years we ourselves once knew, when wounds can be so grievous, disappointment so profound, and mistaken choices so tragic, but when moral acts and self-fulfillment are still in reach. Whether or not the films we mention violate the CPPA, they explore themes within the wide sweep of the statute's prohibitions. If these films, or hundreds of others of lesser note that explore those subjects, contain a single graphic depiction of sexual activity within the statutory definition, the possessor of the film would be subject to severe punishment without inquiry into the work's redeeming value. This is inconsistent with an essential First Amendment rule: The artistic merit of a work does not depend on the presence of a single explicit scene. See *Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Mass.*, 383 U. S. 413, 419 (1966) (plurality opinion) ("[T]he social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness"). Under *Miller*, the First Amendment requires that redeeming value be judged by considering the work as a whole. Where the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive. See *Kois* v. *Wisconsin*, 408 U. S. 229, 231 (1972) *(per*

*curiam).* For this reason, and the others we have noted, the CPPA cannot be read to prohibit obscenity, because it lacks the required link between its prohibitions and the affront to community standards prohibited by the definition of obscenity.

The Government seeks to address this deficiency by arguing that speech prohibited by the CPPA is virtually indistinguishable from child pornography, which may be banned without regard to whether it depicts works of value. See *New York* v. *Ferber*, 458 U. S., at 761. Where the images are themselves the product of child sexual abuse, *Ferber* recognized that the State had an interest in stamping it out without regard to any judgment about its content. *Id.*, at 761, n. 12; see also *id.*, at 775 (O'CONNOR, J., concurring) ("As drafted, New York's statute does not attempt to suppress the communication of particular ideas"). The production of the work, not its content, was the target of the statute. The fact that a work contained serious literary, artistic, or other value did not excuse the harm it caused to its child participants. It was simply "unrealistic to equate a community's toleration for sexually oriented materials with the permissible scope of legislation aimed at protecting children from sexual exploitation." *Id.*, at 761, n. 12.

*Ferber* upheld a prohibition on the distribution and sale of child pornography, as well as its production, because these acts were "intrinsically related" to the sexual abuse of children in two ways. *Id.*, at 759. First, as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated. Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being. See *id.*, at 759, and n. 10. Second, because the traffic in child pornography was an economic motive for its production, the State had an interest in closing the distribution network. "The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material

by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *Id.*, at 760. Under either rationale, the speech had what the Court in effect held was a proximate link to the crime from which it came.

Later, in *Osborne* v. *Ohio*, 495 U. S. 103 (1990), the Court ruled that these same interests justified a ban on the possession of pornography produced by using children. "Given the importance of the State's interest in protecting the victims of child pornography," the State was justified in "attempting to stamp out this vice at all levels in the distribution chain." *Id.*, at 110. *Osborne* also noted the State's interest in preventing child pornography from being used as an aid in the solicitation of minors. *Id.*, at 111. The Court, however, anchored its holding in the concern for the participants, those whom it called the "victims of child pornography." *Id.*, at 110. It did not suggest that, absent this concern, other governmental interests would suffice. See *infra*, at 251–253.

In contrast to the speech in *Ferber*, speech that itself is the record of sexual abuse, the CPPA prohibits speech that records no crime and creates no victims by its production. Virtual child pornography is not "intrinsically related" to the sexual abuse of children, as were the materials in *Ferber*. 458 U. S., at 759. While the Government asserts that the images can lead to actual instances of child abuse, see *infra*, at 251–254, the causal link is contingent and indirect. The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts.

The Government says these indirect harms are sufficient because, as *Ferber* acknowledged, child pornography rarely can be valuable speech. See 458 U. S., at 762 ("The value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*"). This argument, however, suffers from two flaws. First, *Ferber*'s judg-

ment about child pornography was based upon how it was made, not on what it communicated. The case reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the protection of the First Amendment. See *id.*, at 764–765 ("[T]he distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection").

The second flaw in the Government's position is that *Ferber* did not hold that child pornography is by definition without value. On the contrary, the Court recognized some works in this category might have significant value, see *id.*, at 761, but relied on virtual images—the very images prohibited by the CPPA—as an alternative and permissible means of expression: "[I]f it were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized. Simulation outside of the prohibition of the statute could provide another alternative." *Id.*, at 763. *Ferber*, then, not only referred to the distinction between actual and virtual child pornography, it relied on it as a reason supporting its holding. *Ferber* provides no support for a statute that eliminates the distinction and makes the alternative mode criminal as well.

## III

The CPPA, for reasons we have explored, is inconsistent with *Miller* and finds no support in *Ferber*. The Government seeks to justify its prohibitions in other ways. It argues that the CPPA is necessary because pedophiles may use virtual child pornography to seduce children. There are many things innocent in themselves, however, such as cartoons, video games, and candy, that might be used for immoral purposes, yet we would not expect those to be prohibited because they can be misused. The Government, of course, may punish adults who provide unsuitable mate-

rials to children, see *Ginsberg* v. *New York,* 390 U. S. 629 (1968), and it may enforce criminal penalties for unlawful solicitation. The precedents establish, however, that speech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it. See *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115 (1989). In *Butler* v. *Michigan,* 352 U. S. 380, 381 (1957), the Court ·invalidated a statute prohibiting distribution of an indecent publication because of its tendency to "'incite minors to violent or depraved or immoral acts.'" A unanimous Court agreed upon the important First Amendment principle that the State could not "reduce the adult population . . . to reading only what is fit for children." *Id.,* at 383. We have reaffirmed this holding. See *United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 814 (2000) ("[T]he objective of shielding children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative"); *Reno* v. *American Civil Liberties Union,* 521 U. S., at 875 (The "governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults"); *Sable Communications* v. *FCC, supra,* at 130–131 (striking down a ban on "dial-a-porn" messages that had "the invalid effect of limiting the content of adult telephone conversations to that which is suitable for children to hear").

Here, the Government wants to keep speech from children not to protect them from its content but to protect them from those who would commit other crimes. The principle, however, remains the same: The Government cannot ban speech fit for adults simply because it may fall into the hands of children. The evil in question depends upon the actor's unlawful conduct, conduct defined as criminal quite apart from any link to the speech in question. This establishes that the speech ban is not narrowly drawn. The objective is to prohibit illegal conduct, but this restriction goes well

beyond that interest by restricting the speech available to law-abiding adults.

The Government submits further that virtual child pornography whets the appetites of pedophiles and encourages them to engage in illegal conduct. This rationale cannot sustain the provision in question. The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it. The government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Stanley* v. *Georgia*, 394 U. S. 557, 566 (1969). First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.

To preserve these freedoms, and to protect speech for its own sake, the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct. See *Kingsley Int'l Pictures Corp.*, 360 U. S., at 689; see also *Bartnicki* v. *Vopper*, 532 U. S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it"). The government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." *Hess* v. *Indiana*, 414 U. S. 105, 108 (1973) *(per curiam)*. The government may suppress speech for advocating the use of force or a violation of law only if "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)*. There is here no attempt, incitement, solicitation, or conspiracy. The Government has shown no more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse. Without a significantly stronger, more direct connection, the Government may not prohibit

speech on the ground that it may encourage pedophiles to engage in illegal conduct.

The Government next argues that its objective of eliminating the market for pornography produced using real children necessitates a prohibition on virtual images as well. Virtual images, the Government contends, are indistinguishable from real ones; they are part of the same market and are often exchanged. In this way, it is said, virtual images promote the trafficking in works produced through the exploitation of real children. The hypothesis is somewhat implausible. If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice.

In the case of the material covered by *Ferber*, the creation of the speech is itself the crime of child abuse; the prohibition deters the crime by removing the profit motive. See *Osborne*, 495 U. S., at 109–110. Even where there is an underlying crime, however, the Court has not allowed the suppression of speech in all cases. *E. g., Bartnicki, supra*, at 529 (market deterrence would not justify law prohibiting a radio commentator from distributing speech that had been unlawfully intercepted). We need not consider where to strike the balance in this case, because here, there is no underlying crime at all. Even if the Government's market deterrence theory were persuasive in some contexts, it would not justify this statute.

Finally, the Government says that the possibility of producing images by using computer imaging makes it very difficult for it to prosecute those who produce pornography by using real children. Experts, we are told, may have difficulty in saying whether the pictures were made by using real children or by using computer imaging. The necessary solution, the argument runs, is to prohibit both kinds of im-

ages. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down.

The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted . . . ." *Broadrick* v. *Oklahoma*, 413 U. S., at 612. The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.

To avoid the force of this objection, the Government would have us read the CPPA not as a measure suppressing speech but as a law shifting the burden to the accused to prove the speech is lawful. In this connection, the Government relies on an affirmative defense under the statute, which allows a defendant to avoid conviction for nonpossession offenses by showing that the materials were produced using only adults and were not otherwise distributed in a manner conveying the impression that they depicted real children. See 18 U. S. C. § 2252A(c).

The Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful. An affirmative defense applies only after prosecution has begun, and the speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense. In cases under the CPPA, the evidentiary burden is not trivial. Where the defendant is not the producer of the work, he may have no way of establishing the identity, or even the existence, of the actors. If the evidentiary issue is a serious problem for the Government, as it asserts, it will be at least as difficult

for the innocent possessor. The statute, moreover, applies to work created before 1996, and the producers themselves may not have preserved the records necessary to meet the burden of proof. Failure to establish the defense can lead to a felony conviction.

We need not decide, however, whether the Government could impose this burden on a speaker. Even if an affirmative defense can save a statute from First Amendment challenge, here the defense is incomplete and insufficient, even on its own terms. It allows persons to be convicted in some instances where they can prove children were not exploited in the production. A defendant charged with possessing, as opposed to distributing, proscribed works may not defend on the ground that the film depicts only adult actors. See *ibid.* So while the affirmative defense may protect a movie producer from prosecution for the act of distribution, that same producer, and all other persons in the subsequent distribution chain, could be liable for possessing the prohibited work. Furthermore, the affirmative defense provides no protection to persons who produce speech by using computer imaging, or through other means that do not involve the use of adult actors who appear to be minors. See *ibid.* In these cases, the defendant can demonstrate no children were harmed in producing the images, yet the affirmative defense would not bar the prosecution. For this reason, the affirmative defense cannot save the statute, for it leaves unprotected a substantial amount of speech not tied to the Government's interest in distinguishing images produced using real children from virtual ones.

In sum, § 2256(8)(B) covers materials beyond the categories recognized in *Ferber* and *Miller,* and the reasons the Government offers in support of limiting the freedom of speech have no justification in our precedents or in the law of the First Amendment. The provision abridges the freedom to engage in a substantial amount of lawful speech. For this reason, it is overbroad and unconstitutional.

## IV

Respondents challenge § 2256(8)(D) as well. This provision bans depictions of sexually explicit conduct that are "advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct." The parties treat the section as nearly identical to the provision prohibiting materials that appear to be child pornography. In the Government's view, the difference between the two is that "the 'conveys the impression' provision requires the jury to assess the material at issue in light of the manner in which it is promoted." Brief for Petitioners 18, n. 3. The Government's assumption, however, is that the determination would still depend principally upon the content of the prohibited work.

We disagree with this view. The CPPA prohibits sexually explicit materials that "conve[y] the impression" they depict minors. While that phrase may sound like the "appears to be" prohibition in § 2256(8)(B), it requires little judgment about the content of the image. Under § 2256(8)(D), the work must be sexually explicit, but otherwise the content is irrelevant. Even if a film contains no sexually explicit scenes involving minors, it could be treated as child pornography if the title and trailers convey the impression that the scenes would be found in the movie. The determination turns on how the speech is presented, not on what is depicted. While the legislative findings address at length the problems posed by materials that look like child pornography, they are silent on the evils posed by images simply pandered that way.

The Government does not offer a serious defense of this provision, and the other arguments it makes in support of the CPPA do not bear on § 2256(8)(D). The materials, for instance, are not likely to be confused for child pornography in a criminal trial. The Court has recognized that pandering may be relevant, as an evidentiary matter, to

the question whether particular materials are obscene. See *Ginzburg* v. *United States*, 383 U. S. 463, 474 (1966) ("[I]n close cases evidence of pandering may be probative with respect to the nature of the material in question and thus satisfy the [obscenity] test"). Where a defendant engages in the "commercial exploitation of erotica solely for the sake of their prurient appeal," *id.*, at 466, the context he or she creates may itself be relevant to the evaluation of the materials.

Section 2256(8)(D), however, prohibits a substantial amount of speech that falls outside *Ginzburg*'s rationale. Materials falling within the proscription are tainted and unlawful in the hands of all who receive it, though they bear no responsibility for how it was marketed, sold, or described. The statute, furthermore, does not require that the context be part of an effort at "commercial exploitation." *Ibid.* As a consequence, the CPPA does more than prohibit pandering. It prohibits possession of material described, or pandered, as child pornography by someone earlier in the distribution chain. The provision prohibits a sexually explicit film containing no youthful actors, just because it is placed in a box suggesting a prohibited movie. Possession is a crime even when the possessor knows the movie was mislabeled. The First Amendment requires a more precise restriction. For this reason, § 2256(8)(D) is substantially overbroad and in violation of the First Amendment.

## V

For the reasons we have set forth, the prohibitions of §§ 2256(8)(B) and 2256(8)(D) are overbroad and unconstitutional. Having reached this conclusion, we need not address respondents' further contention that the provisions are unconstitutional because of vague statutory language.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE THOMAS, concurring in the judgment.

In my view, the Government's most persuasive asserted interest in support of the Child Pornography Prevention Act of 1996 (CPPA), 18 U. S. C. § 2251 *et seq.*, is the prosecution rationale—that persons who possess and disseminate pornographic images of real children may escape conviction by claiming that the images are computer generated, thereby raising a reasonable doubt as to their guilt. See Brief for Petitioners 37. At this time, however, the Government asserts only that defendants *raise* such defenses, not that they have done so successfully. In fact, the Government points to no case in which a defendant has been acquitted based on a "computer-generated images" defense. See *id.*, at 37–38, and n. 8. While this speculative interest cannot support the broad reach of the CPPA, technology may evolve to the point where it becomes impossible to enforce actual child pornography laws because the Government cannot prove that certain pornographic images are of real children. In the event this occurs, the Government should not be foreclosed from enacting a regulation of virtual child pornography that contains an appropriate affirmative defense or some other narrowly drawn restriction.

The Court suggests that the Government's interest in enforcing prohibitions against real child pornography cannot justify prohibitions on virtual child pornography, because "[t]his analysis turns the First Amendment upside down. The Government may not suppress lawful speech as the means to suppress unlawful speech." *Ante*, at 255. But if technological advances thwart prosecution of "unlawful speech," the Government may well have a compelling interest in barring or otherwise regulating some narrow category of "lawful speech" in order to enforce effectively laws against pornography made through the abuse of real children. The Court does leave open the possibility that a more complete affirmative defense could save a statute's constitutionality, see *ante*, at 256, implicitly accepting that some

regulation of virtual child pornography might be constitutional. I would not prejudge, however, whether a more complete affirmative defense is the only way to narrowly tailor a criminal statute that prohibits the possession and dissemination of virtual child pornography. Thus, I concur in the judgment of the Court.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join as to Part II, concurring in the judgment in part and dissenting in part.

The Child Pornography Prevention Act of 1996 (CPPA), 18 U. S. C. § 2251 *et seq.*, proscribes the "knowin[g]" reproduction, distribution, sale, reception, or possession of images that fall under the statute's definition of child pornography, § 2252A(a). Possession is punishable by up to 5 years in prison for a first offense, § 2252A(b), and all other transgressions are punishable by up to 15 years in prison for a first offense, § 2252A(a). The CPPA defines child pornography to include "any visual depiction . . . of sexually explicit conduct" where "such visual depiction is, or *appears to be,* of a minor engaging in sexually explicit conduct," § 2256(8)(B) (emphasis added), or "such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that *conveys the impression* that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct," § 2256(8)(D) (emphasis added). The statute defines "sexually explicit conduct" as "actual or simulated—. . . sexual intercourse . . . ; . . . bestiality; . . . masturbation; . . . sadistic or masochistic abuse; or . . . lascivious exhibition of the genitals or pubic area of any person." § 2256(2).

The CPPA provides for two affirmative defenses. First, a defendant is not liable for possession if the defendant possesses less than three proscribed images and promptly destroys such images or reports the matter to law enforcement. § 2252A(d). Second, a defendant is not liable for the remaining acts proscribed in § 2252A(a) if the images involved were

produced using only adult subjects and are not presented in such a manner as to "convey the impression" they contain depictions of minors engaging in sexually explicit conduct. § 2252A(c).

This litigation involves a facial challenge to the CPPA's prohibitions of pornographic images that "appea[r] to be . . . of a minor" and of material that "conveys the impression" that it contains pornographic images of minors. While I agree with the Court's judgment that the First Amendment requires that the latter prohibition be struck down, I disagree with its decision to strike down the former prohibition in its entirety. The "appears to be . . . of a minor" language in § 2256(8)(B) covers two categories of speech: pornographic images of adults that look like children ("youthful adult pornography") and pornographic images of children created wholly on a computer, without using any actual children ("virtual child pornography"). The Court concludes, correctly, that the CPPA's ban on youthful adult pornography is overbroad. In my view, however, respondents fail to present sufficient evidence to demonstrate that the ban on virtual child pornography is overbroad. Because invalidation due to overbreadth is such "strong medicine," *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973), I would strike down the prohibition of pornography that "appears to be" of minors only insofar as it is applied to the class of youthful adult pornography.

## I

Respondents assert that the CPPA's prohibitions of youthful adult pornography, virtual child pornography, and material that "conveys the impression" that it contains actual child pornography are overbroad, that the prohibitions are content-based regulations not narrowly tailored to serve a compelling Government interest, and that the prohibitions are unconstitutionally vague. The Government not only disagrees with these specific contentions, but also requests that

the Court exclude youthful adult and virtual child pornography from the protection of the First Amendment.

I agree with the Court's decision not to grant this request. Because the Government may already prohibit obscenity without violating the First Amendment, see *Miller* v. *California*, 413 U. S. 15, 23 (1973), what the Government asks this Court to rule is that it may also prohibit youthful adult and virtual child pornography that is merely indecent without violating that Amendment. Although such pornography looks like the material at issue in *New York* v. *Ferber*, 458 U. S. 747 (1982), no children are harmed in the process of creating such pornography. *Id.*, at 759. Therefore, *Ferber* does not support the Government's ban on youthful adult and virtual child pornography. See *ante*, at 249–251. The Government argues that, even if the production of such pornography does not directly harm children, this material aids and abets child abuse. See *ante*, at 251–254. The Court correctly concludes that the causal connection between pornographic images that "appear" to include minors and actual child abuse is not strong enough to justify withdrawing First Amendment protection for such speech. See *ante*, at 250.

I also agree with the Court's decision to strike down the CPPA's ban on material presented in a manner that "conveys the impression" that it contains pornographic depictions of actual children ("actual child pornography"). 18 U. S. C. § 2256(8)(D). The Government fails to explain how this ban serves any compelling state interest. Any speech covered by § 2256(8)(D) that is obscene, actual child pornography, or otherwise indecent is prohibited by other federal statutes. See §§ 1460–1466 (obscenity), 2256(8)(A), (B) (actual child pornography), 2256(8)(B) (youthful adult and virtual child pornography). The Court concludes that § 2256(8)(D) is overbroad, but its reasoning also persuades me that the provision is not narrowly tailored. See *ante*, at 257–258. The provision therefore fails strict scrutiny. *United States*

v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000).

Finally, I agree with the Court that the CPPA's ban on youthful adult pornography is overbroad. The Court provides several examples of movies that, although possessing serious literary, artistic, or political value and employing only adult actors to perform simulated sexual conduct, fall under the CPPA's proscription on images that "appea[r] to be . . . of a minor engaging in sexually explicit conduct," 18 U. S. C. § 2256(8)(B). See *ante*, at 247–248 (citing Romeo and Juliet, Traffic, and American Beauty). Individuals or businesses found to possess just three such films have no defense to criminal liability under the CPPA. § 2252A(d).

## II

I disagree with the Court, however, that the CPPA's prohibition of virtual child pornography is overbroad. Before I reach that issue, there are two preliminary questions: whether the ban on virtual child pornography fails strict scrutiny and whether that ban is unconstitutionally vague. I would answer both in the negative.

The Court has long recognized that the Government has a compelling interest in protecting our Nation's children. See *Ferber, supra,* at 756–757 (citing cases). This interest is promoted by efforts directed against sexual offenders and actual child pornography. These efforts, in turn, are supported by the CPPA's ban on virtual child pornography. Such images whet the appetites of child molesters, § 121, 110 Stat. 3009–26, Congressional Findings (4), (10)(B), notes following 18 U. S. C. § 2251, who may use the images to seduce young children, *id.*, Finding (3). Of even more serious concern is the prospect that defendants indicted for the production, distribution, or possession of actual child pornography may evade liability by claiming that the images attributed to them are in fact computer generated. *Id.*, Finding (6)(A). Respondents may be correct that no defendant has success-

fully employed this tactic. See, *e. g., United States* v. *Fox,* 248 F. 3d 394 (CA5 2001); *United States* v. *Vig,* 167 F. 3d 443 (CA8 1999); *United States* v. *Kimbrough,* 69 F. 3d 723 (CA5 1995); *United States* v. *Coleman,* 54 M. J. 869 (Army Ct. Crim. App. 2001). But, given the rapid pace of advances in computer-graphics technology, the Government's concern is reasonable. Computer-generated images lodged with the Court by *amici curiae* National Law Center for Children and Families et al. bear a remarkable likeness to actual human beings. Anyone who has seen, for example, the film Final Fantasy: The Spirits Within (H. Sakaguchi and M. Sakakibara directors, 2001) can understand the Government's concern. Moreover, this Court's cases do not require Congress to wait for harm to occur before it can legislate against it. See *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 212 (1997).

Respondents argue that, even if the Government has a compelling interest to justify banning virtual child pornography, the "appears to be . . . of a minor" language is not narrowly tailored to serve that interest. See *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115, 126 (1989). They assert that the CPPA would capture even cartoon sketches or statues of children that were sexually suggestive. Such images surely could not be used, for instance, to seduce children. I agree. A better interpretation of "appears to be . . . of" is "virtually indistinguishable from"—an interpretation that would not cover the examples respondents provide. Not only does the text of the statute comfortably bear this narrowing interpretation, the interpretation comports with the language that Congress repeatedly used in its findings of fact. See, *e. g.,* Congressional Finding (8), notes following 18 U. S. C. § 2251 (discussing how "visual depictions produced wholly or in part by electronic, mechanical, or other means, including by computer, which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children" may whet the appetites of

child molesters). See also *id.*, Findings (5), (12). Finally, to the extent that the phrase "appears to be . . . of" is ambiguous, the narrowing interpretation avoids constitutional problems such as overbreadth and lack of narrow tailoring. See *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932).

Reading the statute only to bar images that are virtually indistinguishable from actual children would not only assure that the ban on virtual child pornography is narrowly tailored, but would also assuage any fears that the "appears to be . . . of a minor" language is vague. The narrow reading greatly limits any risks from "'discriminatory enforcement.'" *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 872 (1997). Respondents maintain that the "virtually indistinguishable from" language is also vague because it begs the question: from whose perspective? This problem is exaggerated. This Court has never required "mathematical certainty" or "'meticulous specificity'" from the language of a statute. *Grayned* v. *City of Rockford*, 408 U. S. 104, 110 (1972).

The Court concludes that the CPPA's ban on virtual child pornography is overbroad. The basis for this holding is unclear. Although a content-based regulation may serve a compelling state interest, and be as narrowly tailored as possible while substantially serving that interest, the regulation may unintentionally ensnare speech that has serious literary, artistic, political, or scientific value or that does not threaten the harms sought to be combated by the Government. If so, litigants may challenge the regulation on its face as overbroad, but in doing so they bear the heavy burden of demonstrating that the regulation forbids a substantial amount of valuable or harmless speech. See *Reno, supra*, at 896 (O'CONNOR, J., concurring in judgment in part and dissenting in part) (citing *Broadrick*, 413 U. S., at 615). Respondents have not made such a demonstration. Respondents provide no examples of films or other materials that are wholly computer generated and contain images that "appea[r] to be . . .

of minors" engaging in indecent conduct, but that have serious value or do not facilitate child abuse. Their overbreadth challenge therefore fails.

### III

Although in my view the CPPA's ban on youthful adult pornography appears to violate the First Amendment, the ban on virtual child pornography does not. It is true that both bans are authorized by the same text: The statute's definition of child pornography to include depictions that "appea[r] to be" of children in sexually explicit poses. 18 U. S. C. § 2256(8)(B). Invalidating a statute due to overbreadth, however, is an extreme remedy, one that should be employed "sparingly and only as a last resort." *Broadrick, supra,* at 613. We have observed that "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily." *Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469, 484–485 (1989).

Heeding this caution, I would strike the "appears to be" provision only insofar as it is applied to the subset of cases involving youthful adult pornography. This approach is similar to that taken in *United States* v. *Grace,* 461 U. S. 171 (1983), which considered the constitutionality of a federal statute that makes it unlawful to "parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement." 40 U. S. C. § 13k (1994 ed.). The term "Supreme Court . . . grounds" technically includes the sidewalks surrounding the Court, but because sidewalks have traditionally been considered a public forum, the Court held the statute unconstitutional only when applied to sidewalks.

Although 18 U. S. C. § 2256(8)(B) does not distinguish between youthful adult and virtual child pornography, the CPPA elsewhere draws a line between these two classes of

speech. The statute provides an affirmative defense for those who produce, distribute, or receive pornographic images of individuals who are actually adults, § 2252A(c), but not for those with pornographic images that are wholly computer generated. This is not surprising given that the legislative findings enacted by Congress contain no mention of youthful adult pornography. Those findings focus explicitly only on actual child pornography and virtual child pornography. See, e. g., Finding (9), notes following § 2251 ("[T]he danger to children who are seduced and molested with the aid of child sex pictures is just as great when the child pornographer or child molester uses visual depictions of child sexual activity produced wholly or in part by electronic, mechanical, or other means, including by computer, as when the material consists of unretouched photographic images of actual children engaging in sexually explicit conduct"). Drawing a line around, and striking just, the CPPA's ban on youthful adult pornography not only is consistent with Congress' understanding of the categories of speech encompassed by § 2256(8)(B), but also preserves the CPPA's prohibition of the material that Congress found most dangerous to children.

In sum, I would strike down the CPPA's ban on material that "conveys the impression" that it contains actual child pornography, but uphold the ban on pornographic depictions that "appea[r] to be" of minors so long as it is not applied to youthful adult pornography.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA joins in part, dissenting.

I agree with Part II of JUSTICE O'CONNOR's opinion concurring in the judgment in part and dissenting in part. Congress has a compelling interest in ensuring the ability to enforce prohibitions of actual child pornography, and we should defer to its findings that rapidly advancing technology soon will make it all but impossible to do so. *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 195 (1997) (we

" 'accord substantial deference to the predictive judgments of Congress' " in First Amendment cases).

I also agree with JUSTICE O'CONNOR that serious First Amendment concerns would arise were the Government ever to prosecute someone for simple distribution or possession of a film with literary or artistic value, such as Traffic or American Beauty. *Ante,* at 262–263 (opinion concurring in judgment in part and dissenting in part). I write separately, however, because the Child Pornography Prevention Act of 1996 (CPPA), 18 U. S. C. § 2251 *et seq.,* need not be construed to reach such materials.

We normally do not strike down a statute on First Amendment grounds "when a limiting construction has been or could be placed on the challenged statute." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613 (1973). See, *e. g., New York* v. *Ferber,* 458 U. S. 747, 769 (1982) (appreciating "the wide-reaching effects of striking down a statute on its face"); *Parker* v. *Levy,* 417 U. S. 733, 760 (1974) ("This Court has . . . repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied"). This case should be treated no differently.

Other than computer-generated images that are virtually indistinguishable from real children engaged in sexually explicit conduct, the CPPA can be limited so as not to reach any material that was not already unprotected before the CPPA. The CPPA's definition of "sexually explicit conduct" is quite explicit in this regard. It makes clear that the statute only reaches "visual depictions" of:

> "[A]ctual or simulated . . . sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; . . . bestiality; . . . masturbation; . . . sadistic or masochistic abuse; or . . . lascivious exhibition of the genitals or pubic area of any person." 18 U. S. C. § 2256(2).

The Court and JUSTICE O'CONNOR suggest that this very graphic definition reaches the depiction of youthful looking adult actors engaged in suggestive sexual activity, presumably because the definition extends to "simulated" intercourse. *Ante,* at 247–248 (majority opinion); *ante,* at 263 (opinion concurring in judgment in part and dissenting in part). Read as a whole, however, I think the definition reaches only the sort of "hard core of child pornography" that we found without protection in *Ferber, supra,* at 773–774. So construed, the CPPA bans visual depictions of youthful looking adult actors engaged in *actual* sexual activity; mere *suggestions* of sexual activity, such as youthful looking adult actors squirming under a blanket, are more akin to written descriptions than visual depictions, and thus fall outside the purview of the statute.[1]

The reference to "simulated" has been part of the definition of "sexually explicit conduct" since the statute was first passed. See Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. 95–225, 92 Stat. 7. But the inclusion of "simulated" conduct, alongside "actual" conduct, does not change the "hard core" nature of the image banned. The reference to "simulated" conduct simply brings within the statute's reach depictions of hardcore pornography that are "made to look genuine," Webster's Ninth New Collegiate Dictionary 1099 (1983)—including the main target of the CPPA, computer-generated images virtually indistinguishable from real children engaged in sexually explicit conduct. Neither actual conduct nor simulated conduct, however, is properly construed to reach depictions such as those in a film portrayal of Romeo and Juliet, *ante,* at 247–248 (majority opinion); *ante,* at 263 (O'CONNOR, J., concurring in judgment

---

[1] Of course, even the narrow class of youthful looking adult images prohibited under the CPPA is subject to an affirmative defense so long as materials containing such images are not advertised or promoted as child pornography. 18 U. S. C. § 2252A(c).

in part and dissenting in part), which are far removed from the hardcore pornographic depictions that Congress intended to reach.

Indeed, we should be loath to construe a statute as banning film portrayals of Shakespearian tragedies, without some indication—from text or legislative history—that such a result was intended. In fact, Congress explicitly instructed that such a reading of the CPPA would be wholly unwarranted. As the Court of Appeals for the First Circuit has observed:

> "[T]he legislative record, which makes plain that the [CPPA] was intended to target only a narrow class of images—visual depictions 'which are virtually indistinguishable to unsuspecting viewers from unretouched photographs of actual children engaging in identical sexual conduct.'" *United States* v. *Hilton*, 167 F. 3d 61, 72 (1999) (quoting S. Rep. No. 104–358, pt. I, p. 7 (1996)).

Judge Ferguson similarly observed in his dissent in the Court of Appeals in this case:

> "From reading the legislative history, it becomes clear that the CPPA merely extends the existing prohibitions on 'real' child pornography to a narrow class of computer-generated pictures easily mistaken for real photographs of real children." *Free Speech Coalition* v. *Reno*, 198 F. 3d 1083, 1102 (CA9 1999).

See also S. Rep. No. 104–358, pt. IV(C), at 21 ("[The CPPA] does not, and is not intended to, apply to a depiction produced using *adults* engaging i[n] sexually explicit conduct, even where a depicted individual may appear to be a minor" (emphasis in original)); *id.*, pt. I, at 7 ("[The CPPA] addresses the problem of 'high-tech kiddie porn'"). We have looked to legislative history to limit the scope of child pornography statutes in the past, *United States* v.

*X-Citement Video, Inc.*, 513 U. S. 64, 73–77 (1994), and we should do so here as well.[2]

This narrow reading of "sexually explicit conduct" not only accords with the text of the CPPA and the intentions of Congress; it is exactly how the phrase was understood prior to the broadening gloss the Court gives it today. Indeed, had "sexually explicit conduct" been thought to reach the sort of material the Court says it does, then films such as Traffic and American Beauty would not have been made the way they were. *Ante*, at 247–248 (discussing these films' portrayals of youthful looking adult actors engaged in sexually suggestive conduct). Traffic won its Academy Award in 2001. American Beauty won its Academy Award in 2000. But the CPPA has been on the books, and has been enforced, since 1996. The chill felt by the Court, *ante*, at 244 ("[F]ew legitimate movie producers . . . would risk distributing images in or near the uncertain reach of this law"), has apparently never been felt by those who actually make movies.

To the extent the CPPA prohibits possession or distribution of materials that "convey the impression" of a child engaged in sexually explicit conduct, that prohibition can and should be limited to reach "the sordid business of pandering" which lies outside the bounds of First Amendment protection. *Ginzburg* v. *United States*, 383 U. S. 463, 467 (1966); *e. g., id.*, at 472 (conduct that "deliberately emphasized the sexually provocative aspects of the work, in order to catch the salaciously disposed," may lose First Amendment protection); *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 831–832 (2000) (SCALIA, J., dissenting) (collecting cases). This is how the Government asks us to construe the statute, Brief for Petitioners 18, and n. 3; Tr. of Oral Arg. 27, and it is the most plausible reading of the text, which prohibits only materials *"advertised, promoted, presented, described, or distributed in such a manner* that conveys the

---

[2] JUSTICE SCALIA does not join this paragraph discussing the statute's legislative record.

impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct." 18 U. S. C. § 2256(8)(D) (emphasis added).

The First Amendment may protect the video shopowner or film distributor who promotes material as "entertaining" or "acclaimed" regardless of whether the material contains depictions of youthful looking adult actors engaged in nonobscene but sexually suggestive conduct. The First Amendment does not, however, protect the panderer. Thus, materials promoted as conveying the impression that they depict actual minors engaged in sexually explicit conduct do not escape regulation merely because they might warrant First Amendment protection if promoted in a different manner. See *Ginzburg, supra,* at 474–476; cf. *Jacobellis* v. *Ohio,* 378 U. S. 184, 201 (1964) (Warren, C. J., dissenting) ("In my opinion, the use to which various materials are put—not just the words and pictures themselves—must be considered in determining whether or not the materials are obscene"). I would construe "conveys the impression" as limited to the panderer, which makes the statute entirely consistent with *Ginzburg* and other cases.

The Court says that "conveys the impression" goes well beyond *Ginzburg* to "prohibi[t] [the] possession of material described, or pandered, as child pornography by someone earlier in the distribution chain." *Ante,* at 258. The Court's concern is that an individual who merely possesses protected materials (such as videocassettes of Traffic or American Beauty) might offend the CPPA regardless of whether the individual actually intended to possess materials containing unprotected images. *Ante,* at 248; see also *ante,* at 263 (O'CONNOR, J., concurring in judgment in part and dissenting in part) ("Individuals or businesses found to possess just three such films have no defense to criminal liability under the CPPA").

This concern is a legitimate one, but there is, again, no need or reason to construe the statute this way. In

*X-Citement Video, supra,* we faced a provision of the Protection of Children Against Sexual Exploitation Act of 1977, the precursor to the CPPA, which lent itself much less than the present statute to attributing a "knowingly" requirement to the contents of the possessed visual depictions. We held that such a requirement nonetheless applied, so that the Government would have to prove that a person charged with possessing child pornography actually knew that the materials contained depictions of real minors engaged in sexually explicit conduct. 513 U. S., at 77–78. In light of this holding, and consistent with the narrow class of images the CPPA is intended to prohibit, the CPPA can be construed to prohibit only the knowing possession of materials actually containing visual depictions of real minors engaged in sexually explicit conduct, or computer-generated images virtually indistinguishable from real minors engaged in sexually explicit conduct. The mere possession of materials containing only suggestive depictions of youthful looking adult actors need not be so included.

In sum, while potentially impermissible applications of the CPPA may exist, I doubt that they would be "substantial . . . in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U. S., at 615. The aim of ensuring the enforceability of our Nation's child pornography laws is a compelling one. The CPPA is targeted to this aim by extending the definition of child pornography to reach computer-generated images that are virtually indistinguishable from real children engaged in sexually explicit conduct. The statute need not be read to do any more than precisely this, which is not offensive to the First Amendment.

For these reasons, I would construe the CPPA in a manner consistent with the First Amendment, reverse the Court of Appeals' judgment, and uphold the statute in its entirety.