*310 Justice Souter, with whom Justice Ginsburg joins,
dissenting.
Dealing in obscenity is penalized without violating the First Amendment, but as a general matter pornography lacks the harm to justify prohibiting it. If, however, a photograph (to take the kind of image in this case) shows an actual minor child as a pornographic subject, its transfer and even its possession may be made criminal. New York v. Ferber, 458 U. S. 747, 765-766 (1982); Osborne v. Ohio, 495 U. S. 103,110-111 (1990). The exception to the general rule rests not on the content of the picture but on the need to foil the exploitation of child subjects, Ferber, 458 U. S., at 759-760, and the justification limits the exception: only pornographic photographs of actual children may be prohibited, see id., at 763, 764; Ashcroft v. Free Speech Coalition, 535 U. S. 234, 249-251 (2002). Thus, just six years ago the Court struck down a statute outlawing particular material merely represented to be child pornography, but not necessarily depicting actual children. Id., at 257-258.
The Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (Act), 117 Stat. 650, was enacted in the wake of Free Speech Coalition. The Act responds by avoiding any direct prohibition of transactions in child pornography[1] when no actual minors may be pictured; instead, it prohibits proposals for transactions in pornography when a defendant manifestly believes or would induce belief in a prospective party that the subject of an exchange or exhibition is or will be an actual child, not an impersonated, simulated or “virtual” one, or the subject of a *311 composite created from lawful photos spliced together. The Act specifically prohibits three types of those proposals. It outlaws solicitation of child pornography, as well as two distinct kinds of offers: those “advertising]” or “promoting]” prosecutable child pornography, which recommend the material with the implication that the speaker can make it available, and those “presenting]” or “distributing]” such child pornography, which make the material available to anyone who chooses to take it. 18 U. S. C. §2252A(a)(3)(B) (2000 ed., Supp. V).
The Court holds it is constitutional to prohibit these proposals, and up to a point I do not disagree. In particular, I accept the Court’s explanation that Congress may criminalize proposals unrelated to any extant image. I part ways from the Court, however, on the regulation of proposals made with regard to specific, existing representations. Under the new law, the elements of the pandering offense are the same, whether or not the images are of real children. As to those that do not show real children, of course, a transaction in the material could not be prosecuted consistently with the First Amendment, and I believe that maintaining the First Amendment protection of expression we have previously held to cover fake child pornography requires a limit to the law’s criminalization of pandering proposals. In failing to confront the tension between ostensibly protecting the material pandered while approving prosecution of the pandering of that same material, and in allowing the new pandering prohibition to suppress otherwise protected speech, the Court undermines Ferber and Free Speech Coalition in both reasoning and result. This is the significant element of today’s holding, and I respectfully dissent from it.
I
The easy case for applying the Act would be a proposal to obtain or supply child pornography supposedly showing a real child, when the solicitation or offer is unrelated to any *312 image (that is, when the existence of pornographic “material” was merely “purported”). See ante, at 293 (“The statute does not require the actual existence of child pornography”). A proposal speaking of a pornographic photograph of a child is (absent any disclaimer or qualification) understood to mean a photo of an actual child; the reasonable assumption is that people desiring child pornography are not looking for fake child pornography, so that those who speak about it mean the real thing. Hence, someone who seeks to obtain child pornography (having no specific artifact in mind) “solicits” an unlawful transfer of contraband. 18 U. S. C. § 2252A(a)(3)(B). On the other side of that sort of proposed transaction, someone with nothing to supply or having only nonexpressive matter who purports to present, distribute, advertise, or promote child pornography also proposes an illegal transaction. In both cases, the activity would amount to an offer to traffic in child pornography that may be suppressed, and the First Amendment does not categorically protect offers to engage in illegal transactions. To the extent the speaker intended to mislead others, a conviction would also square with the unprotected status of fraud, see ante, at 299; and even a nonfraudulent speaker who mistakenly believed he could obtain the forbidden contraband to transfer to anyone who accepted an offer couid be validly convicted consistent with the general rule of criminal law, that attempting to commit a crime is punishable even though the completed crime might (or would) turn out to be impossible in fact, see ante, at 300.
The easy cases for constitutional application of the Act are over, however, when one gets to proposals for transactions related to extant pornographic objects, like photos in a dealer’s inventory, for example. These will in fact be the common cases, as the legislative findings attest. See §§ 501(1)-(15), 117 Stat. 676-678. Congress did not pass the Act to catch unsuccessful solicitors or fraudulent offerors with no photos to sell; rather, it feared that “[t]he mere prospect that *313 the technology exists to create composite or computer-generated depictions that are indistinguishable from depictions of real children will allow defendants who possess images of real children to escape prosecution .... This threatens to render child pornography laws that protect real children unenforceable.” Id., § 501(13).
A person who “knowingly” proposes a transaction in an extant image incorporates into the proposal an understanding that the subject of the proposal is or includes that image. Cf. ante, at 300 (“[‘Promotes’] refers to the recommendation of a particular piece of purported child pornography . . . ”). Congress understood that underlying most proposals there will be an image that shows a child, and the proposal referring to an actual child’s picture will thus amount to a proposal to commit an independent crime such as a transfer of child pornography, see 18 U. S. C. §§2252A(a)(l), (2). But even when actual pictures thus occasion proposals, the Act requires no finding that an actual child be shown in the pornographic setting in order to prove a violation. And the fair assumption (apparently made by Congress) is that in some instances, the child pornography in question will be fake, with the picture showing only a simulation of a child, for example, or a very young-looking adult convincingly passed off as a child; in those cases the proposal is for a transaction that could not itself be made criminal, because the absence of a child model means that the image is constitutionally protected. See Free Speech Coalition, 535 U. S., at 246. But under the Act, that is irrelevant. What matters is not the inclusion of an actual child in the image, or the validity of forbidding the transaction proposed; what counts is simply the manifest belief or intent to cause a belief that a true minor is shown in the pornographic depiction referred to.
The tension with existing constitutional law is obvious. Free Speech Coalition reaffirmed that nonobscene virtual pornographic images are protected, because they fail to trigger the concern for child safety that disentitles child pornog *314 raphy to First Amendment protection. See id., at 249-251. The case thus held that pictures without real minors (but only simulations, or young-looking adults) may not be the subject of a nonobscenity pornography crime, id., at 246, 251, and it has reasonably been taken to mean that transactions in pornographic pictures featuring children may not be punished without proof of real children, see, e.g., United States v. Salcido, 506 F. 3d 729, 733 (CA9 2007) (per curiam) (“In [Free Speech Coalition], the Supreme Court held that possession of Virtual’ child pornography cannot constitute a criminal offense. ... As a result, the government has the burden of proving beyond a reasonable doubt that the images were of actual children, not computer-generated images”); cf. Free Speech Coalition, supra, at 255 (“The Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful”). The Act, however, punishes proposals regarding images when the inclusion of actual children is not established by the prosecution, as well as images that show no real children at all; and this, despite the fact that, under Free Speech Coalition, the first proposed transfer could not be punished without the very proof the Act is meant to dispense with, and the second could not be made criminal at all.
II
What justification can there be for making independent crimes of proposals to engage in transactions that may include protected materials? The Court gives three answers, none of which comes to grips with the difficulty raised by the question. The first, ante, at 303, says it is simply wrong to say that the Act makes it criminal to propose a lawful transaction, since an element of the forbidden proposal must express a belief or inducement to believe that the subject of the proposed transaction shows actual children. But this does not go to the point. The objection is not that the Act criminalizes a proposal for a transaction described as being *315 in virtual (that is, protected) child pornography. The point is that some proposals made criminal, because they express a belief that they refer to real child pornography, will relate to extant material that does not, or cannot be, demonstrated to show real children and so may not be prohibited. When a proposal covers existing photographs, the Act does not require that the requisite belief (manifested or encouraged) in the reality of the subjects be a correct belief. Prohibited proposals may relate to transactions in lawful, as well as unlawful, pornography.
Much the same may be said about the Court’s second answer, that a proposal to commit a crime enjoys no speech protection. Ante, at 297. For the reason just given, that answer does not face up to the source of the difficulty: the action actually contemplated in the proposal, the transfer of the particular image, is not criminal if it turns out that an actual child is not shown in the photograph. If Ferber and Free Speech Coalition are good law, the facts sufficient for conviction under the Act do not suffice to show that the image (perhaps merely simulated), and thus a transfer of that image, are outside the bounds of constitutional protection. For this reason, it is not enough just to say that the First Amendment does not protect proposals to commit crimes. For that rule rests on the assumption that the proposal is actually to commit a crime, not to do an act that may turn out to be no crime at all. Why should the general rule of unprotected criminal proposals cover a case like the proposal to transfer what may turn out to be fake child pornography?
The Court’s third answer analogizes the proposal to an attempt to commit a crime, and relies on the rule of criminal law that an attempt is criminal even when some impediment makes it impossible to complete the criminal act (the possible impediment here being the advanced age, say, or simulated character of the child figure). See ante, at 300. Although the actual transfer the speaker has in mind may not turn out to be criminal, the argument goes, the transfer in *316 tended by the speaker is criminal, because the speaker believes[2] that the contemplated transfer will be of real child pornography, and transfer of real child pornography is criminal. The fact that the circumstances are not as he believes them to be, because the material does not depict actual minors, is no defense to his attempt to engage in an unlawful transaction.
But invoking attempt doctrine to dispense with Free Speech Coalition’s real-child requirement in the circumstances of this case is incoherent with the Act, and it fails to fit the paradigm of factual impossibility or qualify for an extended version of that rule. The incoherence of the Court’s answer with the scheme of the Act appears from § 2252A(b)(l) (2000 ed., Supp. V), which criminalizes attempting or conspiring to violate the Act’s substantive prohibitions, including the pandering provision of § 2252A(a)(3)(B). Treating pandering itself as a species of attempt would thus mean that there is a statutory, inchoate offense of attempting to attempt to commit a substantive child pornography crime. A metaphysician could imagine a system like this, but the *317 universe of inchoate crimes is not expandable indefinitely under the actual principles of criminal law, let alone when First Amendment protection is threatened. See 2 W. La-Fave, Substantive Criminal Law § 11.2(a), p. 208 (2d ed. 2003) (“[WJhere a certain crime is actually defined in terms of either doing or attempting a certain crime, then the argument that there is no crime of attempting this attempt is persuasive”).
The more serious failure of the attempt analogy, however, is its unjustifiable extension of the classic factual frustration rule, under which the action specifically intended would be a criminal act if completed. The intending killer who mistakenly grabs the pistol loaded with blanks would have committed homicide if bullets had been in the gun; it was only the impossibility of completing the very intended act of shooting bullets that prevented the completion of the crime. This is not so, however, in the proposed transaction in an identified pornographic image without the showing of a real child; no matter what the parties believe, and no matter how exactly a defendant’s actions conform to his intended course of conduct in completing the transaction he has in mind, if there turns out to be reasonable doubt that a real child was used to make the photos, or none was, there could be, respectively, no conviction and no crime. Thus, in the classic impossibility example, there is attempt liability when the course of conduct intended cannot be completed owing to some fact which the defendant was mistaken about, and which precludes completing the intended physical acts. But on the Court’s reasoning there would be attempt liability even when the contemplated acts had been completed exactly as intended, but no crime had been committed. Why should attempt liability be recognized here (thus making way for “proposal” liability, under the Court’s analogy)?
The Court’s first response is to demur, with its example of the drug dealer who sells something else. Ante, at 300. (A package of baking powder, not powder cocaine, would be an *318 example.) No one doubts the dealer may validly be convicted of an attempted drug sale even if he did not know it was baking powder he was selling. Yet selling baking powder is no more criminal than selling virtual child pornography.
This response does not suffice, however, because it overlooks a difference between the lawfulness of selling baking powder and the lawful character of virtual child pornography. Powder sales are lawful but not constitutionally privileged. Any justification within the bounds of rationality would suffice for limiting baking powder transactions, just as it would for regulating the discharge of blanks from a pistol. Virtual pornography, however, has been held to fall within the First Amendment speech privilege, and thus is affirmatively protected, not merely allowed as a matter of course. The question stands: why should a proposal that may turn out to cover privileged expression be subject to standard attempt liability?
The Court’s next response deals with the privileged character of the underlying material. It gives another example of attempt that presumably could be made criminal, in the case of the mistaken spy, who passes national security documents thinking they are classified and secret, when in fact they have been declassified and made subject to public inspection. Ante, at 303-304. Publishing unclassified documents is subject to the First Amendment privilege and can claim a value that fake child pornography cannot. The Court assumes that the document publication may be punished as an attempt to violate state-secret restrictions (and I assume so too); then why not attempt proposals based on a mistaken belief that the underlying material is real child pornography? As the Court looks at it, the deterrent value that justifies prosecuting the mistaken spy (like the mistaken drug dealer and the intending killer) would presumably validate prosecuting those who make proposals about fake child pornography. But it would not, for there are significant dif *319 ferences between the cases of security documents and pornography without real children.
Where Government documents, blank cartridges, and baking powder are involved, deterrence can be promoted without compromising any other important policy, which is not true of criminalizing mistaken child pornography proposals. There are three dispositive differences. As for the first, if the law can criminalize proposals for transactions in fake as well as true child pornography as if they were like attempts to sell cocaine that turned out to be baking powder, constitutional law will lose something sufficiently important to have made it into multiple holdings of this Court, and that is the line between child pornography that may be suppressed and fake child pornography that falls within First Amendment protection. No one can seriously assume that after today’s decision the Government will go on prosecuting defendants for selling child pornography (requiring a showing that a real child is pictured, under Free Speech Coalition, 535 U. S., at 249-251); it will prosecute for merely proposing a pornography transaction manifesting or inducing the belief that a photo is real child pornography, free of any need to demonstrate that any extant underlying photo does show a real child. If the Act can be enforced, it will function just as it was meant to do, by merging the whole subject of child pornography into the offense of proposing a transaction, dispensing with the real-child element in the underlying subject. And eliminating the need to prove a real child will be a loss of some consequence. This is so not because there will possibly be less pornography available owing to the greater ease of prosecuting, but simply because there must be a line between what the Government may suppress and what it may not, and a segment of that line will be gone. This Court went to great pains to draw it in Ferber and Free Speech Coalition; it was worth drawing and it is worth respecting now in facing the attempt to end-run that line through the provisions of the Act.
*320 The second reason for treating child pornography differently follows from the first. If the deluded drug dealer is held liable for an attempt crime there is no risk of eliminating baking powder from trade in lawful commodities. Likewise, if the mistaken spy is convicted of attempting to disclose classified national security documents there will be no worry that lawful speech will be suppressed as a consequence; any unclassified documents in question can be quoted in the newspaper, other unclassified documents will circulate, and analysts of politics and foreign policy will be able to rely on them. But if the Act can effectively eliminate the real-child requirement when a proposal relates to extant material, a class of protected speech will disappear. True, what will be lost is short on merit, but intrinsic value is not the reason for protecting unpopular expression.
Finally, if the Act stands when applied to identifiable, extant pornographic photographs, then in practical terms Ferber and Free Speech Coalition fall. They are left as empty as if the Court overruled them formally, and when a case as well considered and as recently decided as Free Speech Coalition is put aside (after a mere six years) there ought to be a very good reason. Another pair of First Amendment cases come to mind, compare Minersville School Dist. v. Gobitis, 310 U. S. 586 (1940), with West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624 (1943). In Barnette, the Court set out the reason for its abrupt turn in overruling Gobitis after three years, 319 U. S., at 635-642, but here nothing is explained. Attempts with baking powder and unclassified documents can be punished without damage to confidence in precedent; suppressing protected pornography cannot be.
These differences should be dispositive. Eliminating the line between protected and unprotected speech, guaranteeing the suppression of a category of expression previously protected, and reducing recent and carefully considered First Amendment precedents to empty shells are heavy prices, not to be paid without a substantial offset, which is *321 missing from this case. Hence, my answer that there is no justification for saving the Act’s attempt to get around our holdings. We should hold that a transaction in what turns out to be fake pornography is better understood, not as an incomplete attempt to commit a crime, but as a completed series of intended acts that simply do not add up to a crime, owing to the privileged character of the material the parties were in fact about to deal in.
The upshot is that there ought to be no absolute rule on the relationship between attempt liability and a frustrating mistake. Not all attempts frustrated by mistake should be punishable, and not all mistaken assumptions that expressive material is unprotected should bar liability for attempts to commit a crime. The legitimacy of attempt liability should turn on its consequences for protected expression and the law that protects it. When, as here, a protected category of expression would inevitably be suppressed and its First Amendment safeguard left pointless, the Government has the burden to justify this damage to free speech.
Ill
Untethering the power to suppress proposals about extant pornography from any assessment of the likely effects the proposals might have has an unsettling significance well beyond the subject of child porriography. For the Court is going against the grain of pervasive First Amendment doctrine that tolerates speech restriction not on mere general tendencies of expression, or the private understandings of speakers or listeners, but only after a critical assessment of practical consequences. Thus, one of the milestones of American political liberty is Brandenburg v. Ohio, 395 U. S. 444 (1969) (per curiam), which is seen as the culmination of a half century’s development that began with Justice Holmes’s dissent in Abrams v. United States, 250 U. S. 616 (1919). In place of the rule that dominated the First World War sedition and espionage cases, allowing suppression of speech for *322 its tendency and the intent behind it, see Schenck v. United States, 249 U. S. 47, 52 (1919), Brandenburg insisted that
“the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.” 395 U. S., at 447.
See also G. Stone, Perilous Times: Free Speech in Wartime 522 (2004) (“[Ejxactly fifty years after Schenck, the Supreme Court finally and unambiguously embraced the Holmes-Brandeis version of clear and present danger”).
Brandenburg unmistakably insists that any limit on speech be grounded in a realistic, factual assessment of harm. This is a far cry from the Act before us now, which rests criminal prosecution for proposing transactions in expressive material on nothing more than a speaker’s statement about the material itself, a statement that may disclose no more than his own belief about the subjects represented or his desire to foster belief in another. This should weigh heavily in the overbreadth balance, because “First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.” Free Speech Coalition, 535 U. S., at 253. See also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U. S. 557, 579 (1995) (“The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis”).
*323 IV
I said that I would not pay the price enacted by the Act without a substantial justification, which I am at a loss to find here. I have to assume that the Court sees some grounding for the Act that I do not, however, and I suppose the holding can only be explained as an uncritical acceptance of a claim made both to Congress and to this Court. In each forum the Government argued that a jury’s appreciation of the mere possibility of simulated or virtual child pornography will prevent convictions for the real thing, by inevitably raising reasonable doubt about whether actual children are shown. The Government voices the fear that skeptical jurors will place traffic in child pornography beyond effective prosecution unless it can find some way to avoid the Ferber limitation, skirt Free Speech Coalition, and allow prosecution whether pornography shows actual children or not.
The claim needs to be taken with a grain of salt. There has never been a time when some such concern could not be raised. Long before the Act was passed, for example, pornographic photos could be taken of models one day into adulthood, and yet there is no indication that prosecution has ever been crippled by the need to prove young-looking models were underage.
Still, if I were convinced there was a real reason for the Government’s fear stemming from computer simulation, I would be willing to reexamine Ferber. Conditions can change, and if today’s technology left no other effective way to stop professional and amateur pornographers from exploiting children there would be a fair claim that some degree of expressive protection had to yield to protect the children.
But the Government does not get a free pass whenever it claims a worthy objective for curtailing speech, and I have further doubts about the need claimed here. Although Congress found that child pornography defendants “almost uni *324 versally rais[e]” the defense that the alleged child pornography could be simulated or virtual, §501(10), 117 Stat. 677, neither Congress nor this Court has been given the citation to a single case in which a defendant’s acquittal is reasonably attributable to that defense.[3] See Brief for Free Speech Co *325 alition et al. as Amici Curiae 21-23; Brief for National Law Center for Children and Families et al. as Amici Curiae 10-13. The Government thus seems to be selling itself short; it appears to be highly successful in convicting child pornographers, the overwhelming majority of whom plead guilty rather than try their luck before a jury with a virtual-child defense.[4] And little seems to have changed since the time *326 of Free Speech Coalition, when the Court rejected an assertion of the same interest. See 535 U. S., at 254-255 (“[T]he Government says that the possibility of producing images by using computer imaging makes it very difficult for it to prosecute those who produce pornography by using real children. . . . The necessary solution, the argument runs, is to prohibit both kinds of images. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down”); id., at 259 (Thomas, J., concurring in judgment) (“At this time . . . the Government asserts only that defendants raise such defenses, not that they have done so successfully. In fact, the Government points to no case in which a defendant has been acquitted based on a ‘computer-generated images’ defense”).
Without some convincing evidence to the contrary, experience tells us to have faith in the capacity of the jury system, which I would have expected to operate in much the follow *327 ing way, if the Act were not on the books. If the Government sought to prosecute proposals about extant images as attempts, it would seek to carry its burden of showing that real children were depicted in the image subject to the proposal simply by introducing the image into evidence; if the figures in the picture looked like real children, the Government would have made its prima facie demonstration on that element.[5] The defense might well offer expert testimony to the effect that technology can produce convincing simulations, but if this was the extent of the testimony that came in, the cross-examination would ask whether the witness could say that this particular, seemingly authentic representation was merely simulated. If the witness could say that (or said so on direct), and survived further questioning about the basis for the opinion and its truth, acquittal would have been proper; the defendant would have raised reasonable doubt about whether a child had been victimized (the same standard that would govern if the defendant were on trial for abusing a child personally). But if the defense had no specific evidence that the particular image failed to show actual children, I am skeptical that a jury would have been likely to entertain reasonable doubt that the image showed a real child.
Perhaps I am wrong, but without some demonstration that juries have been rendering exploitation of children unpunishable, there is no excuse for cutting back on the First Amendment and no alternative to finding overbreadth in this Act. I would hold it unconstitutional on the authority of Ferber and Free Speech Coalition.

 I use “child pornography” to mean any pornographic representation (such as a photograph, as in this case) that includes what appears to be a child subject. “True” or “real” child pornography refers to images made directly in pornographic settings with models who are minors; “fake” refers to simulations, components of lawful photos spliced together, or those made with adults looking young enough to be mistaken for minors.

 I leave largely aside the ease of fraudulent proposals passing off virtual . pornography as the real thing. The fact that fraud is a separate category of speech which independently lacks First Amendment protection changes the analysis with regard to such proposals, although it does not necessarily dictate the conclusion. The Court has placed limits on the policing of fraud when it cuts too far into other protected speech. See, e. g., Riley v. National Federation of Blind of N C., Inc., 487 U. S. 781, 787-795 (1988) (invalidating professional fundraiser regulation under strict scrutiny). Also relevant to the analysis would be that the Act is hardly a consumer-protection statute; Congress seems to have cared little for the interests of would-be child pornography purchasers, and the penalties for violating the Act are quite onerous compared with other consumer-protection laws. See Brief for American Booksellers Foundation for Free Expression et al. as Amici Curiae 17, and n. 8 (identifying laws punishing fraud as a misdemeanor or with civil penalties). A court could legitimately question whether the unprotected status of fraud enables the Government to punish the transfer of otherwise protected speech with penalties so apparently disproportionate to the harm that fraud is understood to cause.

 During hearings prior to passage of the Act, the Department of Justice presented Congress with three examples of prosecutions purportedly frustrated by a virtual-child defense. See Hearing on H. R. 1104 and H. R. 1161 before the Subcommittee on Crime, Terrorism, and Homeland Security of the House Committee on the Judiciary, 108th Cong., 1st Sess., 9 (2003) (statement of Daniel P. Collins, Associate Deputy Attorney General). In United States v. Bunnell, No. CRIM.02-13-B-S, 2002 WL 927765 (D Me., May 1,2002), the court allowed the defendant to withdraw his guilty plea after the Ashcroft v. Free Speech Coalition, 535 U. S. 234 (2002), decision. The defendant did not, however, present a virtual-child defense to a jury, nor was he acquitted; indeed the court rejected his motion to dismiss, see Criminal Docket for Case No. 1:02CR00013 (D Me.). (The docket report also indicates that the defendant’s trial was then continued during his prosecution in state court, with the Government moving to dismiss upon receipt of a judgment and commitment from the state court. See ibid.)
In United States v. Reilly, No. 01 CR. 1114(RPP), 2002 WL 31307170 (SDNY, Oct. 15, 2002), the court also allowed a defendant to withdraw a guilty plea after the issuance of Free Speech Coalition, because his plea was founded on a belief that the Government need not prove the involvement of actual children in the material at issue. (After the time of the congressional hearings, the court dismissed the child pornography charges upon the Government’s motion, and the defendant was convicted on multiple counts of transportation of obscene material under 18 U. S. C. § 1462. See Criminal Docket for Case No. 1:01CR01114 (SDNY).)
In United States v. Sims, 220 F. Supp. 2d 1222 (NM 2002), the defendant was convicted after a jury trial at which the Government contended, and the court agreed, that it did not bear the burden of proving that the images at issue depicted actual minors. The Free Speech Coalition decision came down soon afterward, and the defendant filed a post-trial motion for acquittal. The trial court held that the Government did bear the burden of proof and had met it with regard to one count but not with regard to another, upon which it had presented no evidence of the use of actual children. The trial court acquitted the defendant on the latter count, observing that “[t]he government could have taken a more cautionary, approach and presented evidence to prove the use of actual children, but it *325 made the strategic decision not to do so.” 220 F. Supp. 2d, at 1227. The Government did not seek review of this ruling on appeal.
In short, all of the cases presented to Congress involved the short-term transition on the burden-of-proof issue occasioned by the Free Speech Coalition decision; none of them involved a jury or judge’s acquittal of a defendant on the basis of a virtual-child defense.
Nor do the Government’s amici identify other successful employments of a virtual-child defense. One amicus says that Free Speech Coalition spawned serious prosecutorial problems, but the only example it gives of an acquittal is a defendant’s partial acquittal in an Ohio bench trial under an Ohio statute, where the judge convicted the defendant of counts involving images for which the prosecution presented expert testimony of the minor’s identity and acquitted him of counts for which it did not. See Brief for National Law Center for Children and Families et al. as Amici Curiae 11 (citing State v. Tooley, No. 2004-P-0064, 2005-0hio-6709, 2005 WL 3476649 (App., Dee. 16, 2005)). The State apparently did not cross-appeal the acquittals, but in considering defendant’s appeal of his convictions, the Supreme Court of Ohio held that his hearsay objection to the Government’s expert was irrelevant, because “[Free Speech Coalition] did not impose a heightened evidentiary burden on the state to specifically identify the child or to use expert testimony to prove that the image contains a real child.” 114 Ohio St. 3d 366, 381, 2007-Ohio-3698, 872 N. E. 2d 894, 908 (2007). Rather, “[t]he fact-finder in this case, the trial judge, was capable of reviewing the evidence to determine whether the state met its burden of showing that the images depicted real children.” Id., at 382, 872 N. E. 2d, at 909. The case hardly bespeaks a prosecutorial crisis.

 According to the U. S. Department of Justice Bureau of Justice Statistics, in the 1,209 federal child pornography cases concluded in 2006, 95.1% of defendants were convicted. Bureau of Justice Statistics Bulletin, Federal Prosecution of Child Sex Exploitation Offenders, 2006, p. 6 (Dec. 2007), online at http://www.ojp.usdoj.gov/bjs/pub/pdf/fpcseo06.pdf (as visited May 8, 2008, and available in Clerk of Court’s ease file). By comparison, of the 161 child pornography cases concluded in 1996, 96.9% of *326 defendants were convicted. Ibid. Of the 2006 cases, 92.2% ended with a plea. Ibid. The 4.9% of defendants not convicted in 2006 was made up of 4.5% whose charges were dismissed, and only 0.4% who were not convicted at trial. Ibid.
Nor do the statistics suggest a crisis in the ability to prosecute. In 2,376 child pornography matters concluded by U. S. Attorneys in 2006, 58.5% of them were prosecuted, while 37.8% were declined for prosecution, and 3.7% were disposed by a U. S. magistrate judge. Id., at 2. By comparison, the prosecution rate for all matters concluded by U. S. Attorneys in 2006 was 59%. Ibid. Nor did weak evidence make up a disproportionate part of declined prosecutions. Of the child pornography cases declined for prosecution, 24.3% presented problems of weak or inadmissible evidence; 22.7% were declined for lack of evidence of criminal intent; and in 18.7% the suspects were prosecuted on other charges. Id., at 3. In comparison, weak or inadmissible evidence accounted for 53% of declined prosecutions for sex abuse and 20.4% for sex transportation, both sexual exploitation crimes which do not easily admit of a virtual-child defense. Ibid.
None of these data, to be sure, isolates the experience between Free Speech Coalition and the current Act, or breaks down the post-Act numbers by reference to prosecution under the Act. If the generality of the *327 statistics is a problem, however, it is for the Government, which makes the necessity claim.

 The Courts of Appeals to consider the issue have declined to require expert evidence to prove the authenticity of images, generally finding the images themselves sufficient to prove the depiction of actual minors. See, e. g., United States v. Salcido, 506 F. 3d 729, 733-734 (CA9 2007) (per curiam) (collecting cases).