# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 8, 2011 Session

## STATE OF TENNESSEE v. JONATHAN WADE ROSSON

**Direct Appeal from the Circuit Court for Coffee County**
**No. 36418     Vanessa Jackson, Judge**

---

**No. M2010-01361-CCA-R3-CD- Filed May 18, 2012**

---

On March 20, 2009, the defendant, Jonathan Wade Rosson, was convicted of solicitation of a minor to commit aggravated statutory rape, a Class E felony. He was sentenced to two years, with 120 days to be served in confinement in the county jail and the remainder to be served in community corrections as a condition of probation. The defendant appeals his conviction and sentence on numerous grounds, claiming that: (1) the evidence was insufficient to support his conviction; (2) he was deprived of a fair trial by the State's failure to preserve all of the videotape footage taken by all of the surveillance cameras located in the building where the incident occurred on the day in question; (3) the trial court erred by admitting copies of videotape footage preserved from two surveillance cameras into evidence; (4) the statute under which he was convicted is unconstitutionally vague, both facially and as applied to him; and (5) a state law rendering him ineligible for work release programs while serving his sentence that was enacted after the commission of his offense violates the *Ex Post Facto* Clause of the U.S. Constitution by virtue of retroactively increasing the punishment for his crime. After carefully reviewing the record, the relevant laws and precedent, and the arguments of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Perry A. Craft, Brentwood, Tennessee, for the appellant, Jonathan Wade Rosson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Charles Michael Layne, District Attorney General; and Jason M. Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The defendant was indicted by the Coffee County Grand Jury on April 8, 2008, on one count of solicitation of aggravated statutory rape in violation of Tennessee Code Annotated section 39-13-506(c). This charge stemmed from events that occurred at the D.W. Wilson Community Center (the "Center") in Tullahoma, Tennessee, on November 21, 2007. The defendant, an estimator for a construction company, toured the building on that date to collect information and take notes in order to prepare a bid on certain parts of a two-million-dollar renovation project for the center. The defendant was tried before a jury on March 19-20, 2009, at which time the parties presented the following evidence:

The victim in this case took the stand near the end of the trial and testified that he had been friends with another witness (hereinafter referred to as the "victim's friend") since the sixth grade.[1] He testified that on November 21, 2007, he went to this friend's house and the two left to play basketball together at the D.W. Wilson Community Center. While they were playing, they saw some individuals walking through the gym carrying notepads and flip folders. The victim testified that he did not pay any attention to these people. At one point, the victim looked toward the door of the gym and saw the defendant standing in the doorway, motioning for him to come over. He complied, exiting the gym and entering the adjacent hallway.

The victim testified that once he was in the hallway, the defendant asked him how old he was. The victim testified that he replied that he was thirteen. The victim testified that the defendant asked him if he played basketball. He replied that he played for the school's team, West Middle. The victim testified that the defendant asked him if he "ever had a blow job." The victim testified that he responded "What?" The defendant then said "a blow job, do you want one?" The victim testified that he was positive that the defendant used those exact words. The victim testified that following this exchange, he backed up slowly and ran out the hallway door back into the gymnasium. He testified that he yelled to his friend, who was still playing basketball, to "run." He testified that the two ran out a door and went to his friend's house.

On cross-examination, the victim testified that he did not know how many people were in the Center's gymnasium on that day. Defense counsel then attempted to impeach the victim's direct testimony with a prior statement the victim had made to the police, in which

_____

[1] Following policy of the court, we will not identify by name a minor victim of or minor witness to a sex crime.

the victim stated that the defendant "called," rather than "motion[ed]," for him to come over. Defense counsel also pointed out that the victim's statement to police did not contain any mention of the fact that he told the defendant that he played basketball for West Middle. Defense counsel drew attention to the fact that the victim had told police in his statement that he and his friend had run "home," when, in fact, they had gone to his friend's house. The victim attempted to explain this discrepancy by testifying that his friend's house was "pretty much [his] second home." When defense counsel asked the victim if he had ever heard of a "bid job," the victim replied that he had heard of the words "bid" and "job." Finally, defense counsel asked if the victim had ever been mistaken about important things in his life, and the victim stated "maybe."

On re-direct examination, the victim testified that he spent nearly every weekend at his friend's house. He testified that he had spoken with people who chewed tobacco before, that he could normally tell when someone had tobacco in their mouth, and that he did not notice any tobacco in the defendant's mouth on the day of the incident. He testified that the defendant's speech was not slurred and that the noise level in the hallway was not such that he had a difficult time hearing the defendant. The victim also verified his prior statements to police, which were entered into evidence. On re-cross examination, the victim testified that he had never met the defendant before the day of the incident and that he was not familiar with the defendant's voice.

Prior to soliciting the victim's testimony, the State had called Harry Conway, an investigator for the Tullahoma Police Department, to the stand as its first witness. Officer Conway testified that on November 21, 2007, he received a call from his supervisor to respond to the D.W. Wilson Community Center to investigate an allegation of a sex crime. Officer Conway testified that when he arrived, he went immediately to the office area of the building and spoke with several individuals there, including: the victim and his mother; the victim's friend and his friend's father; Mr. Kurt Glick (the Director of the City of Tullahoma Parks and Recreation Department); and Mr. J.P. Kraft (the City Forester of the City of Tullahoma Parks and Recreation Department). He asked several of these individuals to give written statements regarding what had transpired. Afterward, he and Mr. Kurt Glick reviewed some surveillance camera footage and identified the defendant, Mr. Rosson, as the individual appearing in that footage. From the stand, Officer Conway identified the defendant in open court as Mr. Jonathan Wade Rosson, the man appearing in the surveillance camera footage.

Officer Conway testified that during the course of his investigation, he had discovered that the defendant was ostensibly in the building that day for purposes of conducting a "pre-bid" inspection of the Center and that he had signed a "pre-bid" sign-in sheet that had been put out for all of the contractors and employees of businesses that intended to make a bid.

Officer Conway testified that the sign-in sheet bore the defendant's signature, Wade Rosson. By entering that name into the Tennessee driver's license database, Officer Conway was able to locate the defendant's drivers license and make a positive identification of the defendant from his driver's license photograph. Using the phone number left by the defendant on the sign-in sheet, Officer Conway testified that he called the defendant on his cell phone and asked him to return to the D.W. Wilson Center. Officer Conway testified that the defendant refused, claiming that he had traveled too far away from the building to turn around. Officer Conway testified that he placed this phone call between 11:15 and 11:30 a.m.

Officer Conway testified that during his investigation, he reviewed surveillance video footage from the building with the assistance of Mr. J. P. Kraft. Officer Conway testified that he initially asked Mr. Kurt Glick for assistance who, in turn, called Mr. J.P. Kraft to come into the office and operate the computer screen, pulling up different camera angles and showing everything inside the building. Officer Conway focused his search on camera footage that showed interaction between the defendant and either the victim or his friend. Officer Conway testified that as he was reviewing the video footage, he came across various places where there was interaction between the defendant and the two boys. Officer Conway testified that he instructed Mr. Kraft to use the computer to "burn" a DVD containing those portions of the surveillance video footage. Officer Conway testified that there was a considerable amount of additional video footage that showed the defendant, other contractors and architects, recreational staff, and other individuals walking around the facility that was not "burned" to this DVD.

After taking statements from several witnesses and instructing Mr. Kraft to preserve selected segments of videotape, Officer Conway returned to the police department and again contacted the defendant by phone to verify the information appearing on his driver's license. Following this phone call, Officer Conway sought and received a warrant for the defendant's arrest. Officer Conway and a second investigator, Officer Jason Kennedy, then traveled to the defendant's residence in Lawrenceburg, Tennessee, to serve the warrant. When they arrived, the defendant was not at home.

Officer Conway testified that the officers spoke with the defendant's wife, Mrs. Rosson, and informed her of the charge against the defendant. Upon hearing that the charge was solicitation to commit aggravated statutory rape, Mrs. Rosson asked the officers, "was it a boy or [a] girl?" The officers told Mrs. Rosson that they could not answer that question and then asked her, "Has Mr. Rosson behaved strangely before?" The defendant's wife ignored the question, and when the officers asked her a second time, she stated, "I don't want to talk about it."

Eventually, the defendant arrived at his home, and the officers arrested him. Officer

-4-

Conway testified that the defendant was advised of his *Miranda* rights, placed in the back of a police vehicle, and escorted back to Tullahoma. During this trip, the defendant waived his *Miranda* rights and spoke with the officers. Officer Conway asked the defendant, and the defendant confirmed, that he had been at the D.W. Wilson Community Center during the pre-bid process. Officer Conway asked the defendant if he had spoken to anyone under the age of eighteen, or who was a minor, while he was at the Center. The defendant told Officer Conway that he had not. Following these questions, the two conversed about various other subjects before Officer Conway asserted to the defendant that he had, in fact, made a comment to a minor while he was at the Center. The defendant denied making any such comment. At one point, the defendant asked Officer Conway, "has this got to do with taking pictures?" Officer Conway replied that it did not.

Officer Conway testified that he asked the defendant if he would be willing to provide a written statement to the police when they arrived at the police department, and that the defendant agreed and did so. The State then introduced into evidence a photocopy of the defendant's statement to the Tullahoma Police Department, along with his written waiver of the *Miranda* warnings. Officer Conway testified that after the defendant signed his written statement, he handed the defendant a copy of his arrest warrant and the accompanying affidavit and allowed him to read it. At some point while reading this statement, the defendant looked up and said, "Videotape? Videotape?" At that point, Officer Conway testified that the defendant became very upset and refused to talk any further. Officer Conway concluded his direct testimony by stating that during his investigation, he had been able to determine the exact location of the verbal exchange between the defendant and the victim, and that this location was in Coffee County, Tennessee.

On cross-examination, Officer Conway testified that he directed Mr. Kraft to copy only certain specific video surveillance footage related to the interaction between the defendant and the victim or his friend. He did not instruct Mr. Kraft to preserve all of the video surveillance footage that was available on the computer. Officer Conway also testified that he had no idea how many people might have entered the hallway next to the gymnasium during the pre-bid process. Officer Conway testified that, on the day of the alleged crime, the defendant may have driven a pickup truck with his company's name and telephone number written on the side of it. Officer Conway confirmed that the defendant had signed the pre-bid meeting sign-in sheet on the day of the alleged crime using his real name and his actual company and telephone number and that Officer Conway did, in fact, use the telephone number listed on that sheet to contact the defendant.

Officer Conway also testified that, for the duration of the ninety-minute drive back to the Tullahoma police station, the defendant was seated with his hands cuffed behind his back and that sitting in this position would not have been comfortable. Officer Conway

testified that although he had the means available to him to record the entire conversation he had with the defendant during that drive back, he chose not to do so. Officer Conway also testified that he had the capability and the discretion to record the conversation that he had with the defendant at the police station on the night of his arrest and that he had elected not to record that conversation as well. Officer Conway testified that it was his understanding from Mr. Kraft that the video surveillance system in place in the Center did not have an audio component. Officer Conway testified that during his review of the video, there was no indication that any touching had occurred between the defendant and any of the juveniles.

On redirect examination, Officer Conway testified that there were more than ten cameras in operation at the building on the day of the alleged incident. Officer Conway testified that approximately half an hour elapsed between the time the first contractors arrived at the Center and the last segment of time that was preserved in the DVD of the video surveillance footage. Officer Conway testified that under the facts of the case, he did not deem it necessary to review the full six to ten hours of video surveillance footage from each camera. Officer Conway testified that he did not cut anything out of the video surveillance footage that he retrieved or leave out anything from the footage he preserved that would have been helpful to either the defense or the prosecution in this case. The State then questioned Officer Conway regarding testimony that the defendant had given at a previous hearing. Officer Conway read portions of the transcript of that prior hearing into the record. In those portions, the defendant stated that: (1) he was not given a copy of the arrest warrant on the evening of his arrest; (2) he was not informed on the evening of his arrest that there was video surveillance footage of him; and (3) he never got angry on the night of his arrest. The witness read further testimony from the defendant in which the defendant asserted that even after seeing the video surveillance footage, he still could not remember having had a conversation with the victim on the date in question, notwithstanding the fact that, in his line of business, he did not come in contact with a lot of children.

Next, the State presented the testimony of Mr. Kurt Glick, the Director of Parks and Recreation (the "department") in Tullahoma. Mr. Glick testified that the D.W. Wilson Community Center was a thirty-year-old facility that was scheduled to undergo a major renovation at the time of the alleged incident. He testified that the Center had an indoor swimming pool, an outdoor swimming pool, a gymnasium, some meeting rooms, and a weight room. He testified that in November of 2007, the department held a pre-bid meeting concerning the renovation, during which the department took various contractors around the building and showed them the site. Mr. Glick testified that approximately fifteen individuals attended this meeting, along with a few of his own staff members. He testified that the defendant attended this meeting and, at some point, took a walk-through of the Center. He testified that the Center was not crowded on the day of the meeting and that the noise level in the hallway where the incident allegedly occurred was not high. He further testified that

during the time he spent with the defendant on that day, the defendant was not chewing tobacco. Mr. Glick testified that if he had noticed the defendant chewing tobacco he would have instructed him not to do so because a city ordinance prohibited the chewing of tobacco in the facility.

Mr. Glick testified that at some point just before lunch on the day in question, he was informed that an incident had occurred in the building. An individual who worked with him for the City of Tullahoma pulled up to the facility in a vehicle and had two boys with him. Mr. Glick testified that the group went into his office to examine the surveillance footage and to try and identify the individual involved in the incident. Mr. Glick testified that he called Mr. Kraft into the office to operate the video system. He testified that some police officers also arrived. He testified that he went in and out of the office as the officers conducted their investigation and the group reviewed the video surveillance footage and that nothing he viewed during this time led him to believe that any evidence had been destroyed or hidden during the ensuing investigation.

On cross-examination, Mr. Glick verified, and defense counsel entered into evidence, various drawings and schematics of the D.W. Wilson Center before its renovation. The witness also verified, and defense counsel entered in the evidence, the sign-in sheet from the pre-bid meeting, which listed the defendant by his name and contained his company name and telephone number. Mr. Glick testified concerning a number of different contractors and subcontractors who had attended the pre-bid meeting. The witness testified in great detail concerning the scope, difficulty, and intricacy involved in the overall renovation. Mr. Glick testified that prior to the incident, while he was walking through the gymnasium, he told two boys who were playing basketball to stop because he wanted it to be quieter while he was talking. The witness also testified that there was noise being generated by various vending and other machines in the building and hallway where the incident occurred. The witness testified as to the location of various video cameras in the building and stated that he was not aware precisely which cameras were working on the day of the incident. The witness testified that the video surveillance footage taken by the Center's surveillance cameras was saved on a computer hard drive located in the office for thirty days. The witness testified that if anyone had instructed him to do so, he would have saved all the surveillance footage from all of the cameras that were operating on that day, assuming it was possible to do so. The witness also testified that it was common for people in the gymnasium and other areas of the recreational center to make noise.

The next witness to testify for the State was Mr. J.P. Kraft, the City Forester of the City of Tullahoma Parks and Recreation Department. Mr. Kraft testified that he had worked for the city for approximately three years and maintained an office in the D.W. Wilson Community Center. He testified that he was present in the building but did not attend the

pre-bid meeting. At some point on the day of the incident, he was requested to come to the front office to review security camera footage. Mr. Kraft testified that the video surveillance footage at the Center was recorded by a computer and was kept on a hard drive for thirty days. Mr. Kraft testified that the Center had thirteen surveillance cameras, that those cameras were motion activated, and that the cameras operated twenty-four hours a day. Mr. Kraft testified that any motion would activate the cameras, such as a car driving down the street, a person walking, or a tree limb blowing, and that as long as there was motion, the cameras would record. Mr. Kraft testified that he was the one who copied selected video surveillance footage from the office computer's hard drive to a DVD. He testified that when using the computer to "burn" the video camera footage to a DVD, a person could select a start time and end time for the video and move the entire selected piece, but that it was not possible to move either more or less than the full footage for the period of time selected. He testified that he had copied the two video segments that appeared on the DVDs in their entirety, and that the videos appearing on the DVDs were a full, fair and accurate depiction of the footage he had removed from the building's computer. Mr. Kraft testified that in the video surveillance footage that was saved to the DVDs, there were small time lapses and jumps in the video and that these skips and jumps were the natural result of the motion sensors.

The State then attempted to enter the two DVDs made by Mr. Kraft into evidence. The defense objected and sought and received permission to cross-examine the witness before the videos were admitted. During this cross-examination, the witness admitted that every skip, jump, and fast-forward appearing in the videos was not the result of the motion sensors. The witness admitted that he was unsure of the cause of some of the skips, jumps, and fast-forwards appearing in the video and that he had no explanation for why the video would "freeze" on occasion. The witness testified that the original computer hard drive no longer existed and that there was presently no way to check the original surveillance camera footage against the DVDs that he had copied and burned.

Following this cross-examination, the DVDs were entered into evidence over the defense's objection, and the jury viewed the videos. As the direct examination resumed, the witness testified that none of the cameras in the Center possessed audio capabilities. The witness testified that as far as he knew, every camera in the building was working on the day of the incident. The witness testified that one video appeared to show a young man, the victim, walk out of the gymnasium and into the adjoining hallway to speak with the defendant. The witness testified that there was a second camera that was operable that day that would have shown the same area but that he did not save the footage from that camera. The witness identified footage from another camera, located in the gymnasium, that appeared to show the victim exiting the gymnasium, reentering shortly thereafter, and running toward the back door. A moment later, that same video showed the defendant exiting the back door. The witness testified that he reviewed all the video footage from all the cameras on the day

of the incident and that, after leaving, the defendant did not reappear on any of the building's video surveillance footage. The witness testified that he believed that the video footage that had been shown to the jury was a full and fair depiction of what had happened on the day in question and that nothing relevant had been left out.

On cross-examination, Mr. Kraft testified that there was a second operational camera in the gymnasium and numerous other operational cameras that would have shown different perspectives of the activity before, during, and after the incident on the day in question. The witness testified that he could not identify everyone who appeared in all of the footage from all thirteen cameras on the day of the incident. He testified that he was the person who selected the camera footage and time of each video that was saved to the DVDs. He testified that the police did not instruct him regarding precisely what footage to select, nor did they instruct him to save all of the footage from all of the cameras. He testified that had the police instructed him to do so, he would have saved all of the footage from every camera on the day in question. Following this testimony, defense counsel reviewed the two videos that were shown to the jury in extreme detail with the witness and questioned him regarding various skips and jumps appearing in those videos. The witness generally testified that he could not explain the various skips and jumps appearing in the videos and occasionally speculated that they might have resulted from the motion activated nature of the cameras. The witness ultimately admitted that because people do not stop, skip, or freeze in real life, the video footage that had been shown to the jury was not an accurate depiction of what had occurred on the day in question. The witness also extensively discussed what additional areas could have been viewed from other camera angles had all of the surveillance footage from all of the cameras been preserved. The witness testified that he did not know how long it would have taken for him to burn all of the video footage from all thirteen cameras to DVDs, but he indicated that he did not believe that it would have been an all-day job. He further testified that nothing prevented him from copying the footage from every camera. After giving this testimony, the witness verified, and the defense entered into evidence, a sheet stipulating the length of the footage of the two videos that had been burned to DVDs and the numbers of skips and fast-forwards that appeared on each video.

The State's next witness was Mr. Joe Brown, the Public Service Officer at the Tullahoma High School. Officer Brown testified that he had been in law enforcement for thirteen years and that he was the father of the victim's friend. He testified that the victim and his son were good friends. He testified that on November 21, 2007, both boys asked him for permission to go to the D.W. Wilson Community Center, which he granted. He stated that the boys left his house at approximately 10:00 a.m. and that he saw them again forty-five minutes later. He testified that when the boys returned, they ran through the door together and that they appeared to be agitated and scared. He testified that the victim told him that he needed to come back to the Center because something had happened. He further testified

that his son told him that someone had tried to do something to the victim at the gym. Specifically, a man had approached the victim and asked him if he wanted a "blow job."

Officer Brown testified that he returned to the Center and apprised certain individuals there of the situation. He unsuccessfully attempted to locate the individual that had spoken to the victim based on a general description of the individual's clothing. He then called the police, and Investigator Harry Conway responded. Officer Brown testified that one of the employees at the Center provided an initial tentative identification of the defendant based on a description provided to her by the boys. He then walked back into the office where Mr. Kraft was looking at the security camera footage on a computer. Sometime later, Mr. Kraft announced that he had found a man matching the description provided by the boys, and he reviewed the video footage of the incident. Officer Brown testified that he took the boys home after Officer Conway finished interviewing them.

On cross-examination, Officer Brown testified that when he viewed the video footage on the computer, he did not notice any skips, jumps, or fast-forwards. He testified that he, his son, Mr. Kraft, Mr. Glick, Mr. Conway, and the victim were all in the office at various points while the security camera footage was being reviewed.

The State's next witness was the victim's friend, who testified that he was thirteen years old, that he attended West Middle School, and that he was in the eighth grade. The victim's friend further testified that on November 21, 2007, he was playing basketball in the gym at the D.W. Wilson Community Center with the victim. The victim's friend testified that he had seen the two videos that had been shown to the jury that were taken by surveillance cameras at the Center that morning, and he identified himself as one of the two boys playing basketball on that footage. He testified that at some point while they were playing, he saw the defendant in the gymnasium, looking at the floor and at the ceiling. Later, he saw the defendant at the door to the gym that led into the adjoining hallway. The victim's friend testified that the defendant gestured to him with his finger to come over but that he assumed this gesture was intended for someone else and ignored it. Afterward, he saw the victim exit the gym through the door where the defendant was located. A few seconds later, he saw the victim "bust" through the door and run back into the gym. The victim's friend testified that the victim was very scared when he re-entered the gym and that the victim told him to grab his stuff and come with him. He testified that he ran after the victim and that the two left the Center and went down the street. At some point afterward, the victim became afraid that a car was following them and told him to hide behind an air conditioning unit at a nearby house. The victim's friend testified that while they were hiding the victim told him what had happened. At that point, the boys went to his house and told his father what had transpired.

On cross-examination, the victim's friend admitted that: (1) he did not know how many people were in the gymnasium that day; (2) he was not present in the hallway when the incident occurred; (3) he never exchanged words with the defendant and could not identify his voice; (4) he never got closer to the defendant than thirty or forty feet; and (5) everything he knew about the incident was based on what the victim had told him.

Following this testimony, the State rested. The defense moved for a judgment of acquittal on the grounds that (1) the conduct at issue did not come under the ambit of the statute, and (2) his client's ability to put forth a defense had been jeopardized by the failure of the police to preserve all of the video surveillance footage. The trial court denied the motion.

The defense presented the testimony of Ms. Lori Ann Worthington, a client manager for an architectural and engineering company who attended the pre-bid meeting on the date in question. Ms. Worthington testified that approximately fifteen to seventeen people attended that meeting. She identified some pictures that had been taken of the building, which were admitted into evidence. She testified that following the pre-bid meeting, all of the contractors were taken on a tour of the building. The witness was shown portions of the video camera surveillance footage that had been entered into evidence and identified herself when she appeared on the tape.

The witness was cross-examined by the State concerning some of the pictures that had been entered into evidence and testified that the pictures, which showed "some pretty messed-up metal," reflected some damage that had occurred to the structural frame of the indoor swimming pool. The witness further testified that one of the major problems with the D.W. Wilson Community Center at the time was that the indoor swimming pool had been closed because the structure was in danger of collapse. The witness said this was a major portion of the project and that, while her firm refinished the gymnasium floor, painted the walls, and installed new lights, they probably spent less than one-fifth of their time on that day talking about the gymnasium. She testified that she measured the hallway adjoining the gymnasium on the day in question and that, when she finished her measuring and walked out, the only person left in the hallway was the defendant. On re-direct examination, the witness testified that she did not remember everyone who was at the meeting that day and did not remember every conversation she had on that day.

The defense also read into the record portions of testimony given at a prior hearing by a witness named Mr. Bob Shane. Mr. Shane's testimony was that he was an engineer for an electrical subcontractor and that he had attended the pre-bid meeting at the D.W. Wilson Community Center on the date in question. He stated that he had worked with the defendant and his company, Clanton Construction, on prior occasions. Mr. Shane stated that he

accompanied the defendant during a portion of their post-meeting tour and stated that they talked about various construction-related topics. He testified that on the day of the incident, the defendant was wearing a shirt that said "Clanton Construction" on it. The witness stated on cross-examination that he did not see the defendant with any boys on the day of the meeting and that he was not there when the defendant met with the boy shown on the video.

After this testimony had been read into the record, the defendant was advised of and waived his right to testify in his own defense pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999). Following the usual *Momon* dialogue, the parties made closing arguments and the jury was charged. The jury retired to begin deliberations at 2:36 p.m., conveyed a question to the court that was subsequently addressed in open court, retired again to deliberations, and returned at 4:15 p.m. with a verdict finding the defendant guilty of solicitation to commit aggravated statutory rape as charged.

On June 26, 2009, the defendant was sentenced to "two (2) years in the Coffee County Jail, split confinement for 120 days, balanced to be served with community corrections as a condition of probation. In addition, the Court is not opposed to work release." The defendant filed timely motions for a judgment of acquittal and for a new trial, which were denied by the trial court on May 18, 2010. The defendant filed a timely notice of appeal, which we now address on the merits.

## ANALYSIS

The defendant raises five issues in his appeal. First, he claims that the evidence adduced at trial was insufficient to support his conviction. Second, he claims that he was deprived of a fair trial by the State's failure to preserve videotape footage taken by all of the Center's surveillance cameras on the day in question. Third, he claims that the trial court erred by admitting into evidence two DVDs containing videotape footage selected from two of the Center's many surveillance cameras. Fourth, he claims that the statute under which he was convicted is unconstitutionally overbroad and vague in violation of the Due Process Clause of the United States Constitution and its state counterpart, both facially and as applied to him. Finally, the defendant challenges the terms of his sentence, claiming that a state law, passed after the commission of his offense and rendering him ineligible for work release programs, violates the *Ex Post Facto* Clause of the United States Constitution. For the reasons that follow, we deny each of these claims and affirm the judgment of the trial court.

## I.

The defendant's first claim – that the brief verbal exchange at issue did not constitute a persuasion, invitation, or attempt to induce the victim into a sex act – is tantamount to a

challenge to the sufficiency of the evidence used to convict him. "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). After examining all of the evidence in the light most favorable to the State and asking whether any rational trier of fact could have found the essential elements of the crime in question beyond a reasonable doubt, as we are required to do when resolving a defendant's sufficiency of the evidence challenge, *see id.,* we conclude that the defendant has failed to overcome the presumption of guilt.

The defendant was convicted of violating Tennessee Code Annotated section 39-13-528(a), solicitation of a minor, which renders it a crime "for a person eighteen (18) years of age or older, by means of oral . . . communication . . . to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age . . . to engage in conduct that, if completed, would constitute a violation by the soliciting adult" of several specifically-enumerated sex crimes. One of those crimes is aggravated statutory rape, defined as "unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim." T.C.A. 39-13-506(c). The defendant does not dispute that performing a "blow job" on the victim would violate section 39-13-506(c), based on the nature of the sex act at issue and the parties' respective ages. Rather, the defendant argues that the State failed to prove that his conduct constituted solicitation.

The defendant's argument is that the victim's testimony that the defendant asked him "Have you ever had a blow job?" and "Would you like one?" was insufficient to establish that a solicitation occurred. In the opinion of this court, however, not only are such statements sufficient evidence to support a conviction for solicitation, taken together they constitute a classic example of solicitation to commit the type of sex crime at issue.

Heard either alone or in the context of a conversation, the words "[w]ould you like [a blow job]" could be reasonably construed both as an invitation to receive oral sex and an attempt to induce the listener to receive oral sex. Furthermore, in only the rarest of instances could such words reasonably be understood as serving any other purpose. The defendant argues that both the rule of lenity and strict construction of the statute at issue require that the terms "invitation" and "attempt to induce" be interpreted in the narrowest possible sense and that urges that these terms do not forbid the mention of the words "blow job" to a minor. But the victim's testimony established that this defendant did more than let the words "blow job" slip in the course of casual conversation with a minor. The victim's testimony was that

the defendant asked him if he wanted one.

The defendant makes much of the fact that the evidence adduced at trial established that the conversation at issue took less than twenty seconds and strongly implies that this period of time is too brief for the defendant to have committed such a serious felony. However, the elements of section 39-13-528(a) do not embrace any temporal requirement; there is no discrete period of time too brief to permit an individual to commit an unlawful solicitation so long as the individual's conduct satisfies all of the requisite statutory elements.

The defendant also urges this court that the mere act of asking whether someone wants a blow job cannot be reasonably construed as an offer by the speaker to provide one. However, in this case the court is not confronted with a situation in which the defendant chose vague or discrete words with which to convey his unlawful desires. The victim testified that the defendant solicited him in the most direct of possible terms.

Viewing the victim's testimony in the light most favorable to the State, a reasonable jury could have found that the defendant solicited the victim to engage in aggravated statutory rape when he asked the victim if he wanted a "blow job." The defendant's claim is therefore denied.

## II.

The defendant claims that the State violated his federal and state constitutional rights by failing to preserve all of the remaining footage from the two cameras used to create the DVDs that were entered into evidence by the prosecution as well as all of the video footage taken by eleven other surveillance cameras on the day of the alleged incident – including the footage from a second camera located in the gymnasium and a second camera located in the adjoining hallway where the incident occurred, which presumably would have shown the same incident from different angles. The State responds that the defendant has waived appellate review of this issue by virtue of his failure to prepare an adequate record. Even if not waived, the State argues that the defendant has failed to show any exculpatory evidence was lost or destroyed.

We first address the issue of waiver. A party seeking appellate review of an issue has a duty to prepare a record that conveys a "complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). The defendant initially raised his claim concerning the State's failure to preserve evidence in the trial court by filing a "Motion *in Limine*: Missing Evidence." He raised the issue again in his motion for new trial. The defendant included in the record a copy of the trial court's brief written order denying his motion for a new trial.

However, the defendant neglected to include in the appellate record a copy of any transcript from any hearing that may have been held on his motion *in limine*. The defendant also did not include the transcript of the hearing on his motion for a new trial. Lacking these transcripts, some danger exists that this court might misconstrue the trial court's reasons for denying the defendant's claim. The defendant assumed a strong risk that this court would find waiver when he failed to include either transcript. However, because the defendant clearly preserved the issue itself in his motions and on appeal, because the trial transcripts that the defendant did include in the record contain extensive discussion between the parties and the trial court on this issue, and because the issue involved is one of pure law, we deem this record sufficiently complete to avoid waiver on this occasion.

Concerning the merits of the defendant's claim: When the State's failure to preserve allegedly exculpatory evidence is at issue, the key issue is whether, in the context of the entire record, the defendant received a fundamentally fair trial. *See State v. Ferguson*, 2 S.W.3d 912, 914, 918 (1999). Resolution of this issue is a two-step process. *See id.* at 917-18. First, a court must ascertain whether the State had and breached a duty to preserve the evidence. If a court determines that the State had a duty to preserve evidence and that duty was breached, then the court must proceed to the next step: determining the consequences of that breach, bearing in mind the degree of negligence involved, the significance of the destroyed evidence in light of available substitute evidence, and the sufficiency of other evidence used at trial to support the conviction. *Id.*

Reasonable minds might question whether the State had any duty to preserve the videotape footage taken by all of the Center's cameras on the day in question – footage whose only alleged exculpatory value was that it did not show the defendant stalking the victim, waiting until the victim was alone before approaching him, or otherwise lurking about the Center absent a lawful purpose. We opt to follow the example set by our supreme court in *Ferguson*. In that case, although the court found the missing evidence at issue in that case to be of "tenuous" and "marginal" exculpatory value, it found nonetheless that the State's duty to preserve that evidence had been breached and went on to consider what consequences should flow from that breach in light of the legally-relevant factors: (1) the degree of negligence involved, (2) the significance of the missing evidence, and (3) the sufficiency of the convicting evidence. *Id.* at 918. Even assuming that the State had and breached a duty to preserve the missing surveillance camera footage from the day in question, consideration of these same three factors leads this court to conclude that the defendant's due process rights were not violated.

First, the defendant has not shown that the police acted in bad faith or were grossly negligent in permitting the missing video surveillance footage to be erased. Therefore, as in *Ferguson*, the State's degree of culpability was slight.

Second, the missing evidence was of minimal evidentiary significance. Numerous witnesses testified that there was nothing in the missing videotape footage that would have been helpful to either the prosecution or the defense. These witnesses were subjected to cross-examination on the subject. Consequently, "In our view, the defendant has failed to establish that the videotape contained evidence favorable to the defense." *State of Tennessee v. Rodney Southers*, No. E2004-01136-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 328, at *23 (April 7, 2005).

Moreover, surveillance camera footage in general was of very limited evidentiary value in this case because it lacked any audio component, and the key issue at trial was whether the defendant verbally solicited the victim. Nothing in the surveillance camera footage, whether it was preserved or destroyed, had the ability to establish whether the precise verbal exchange alleged by the victim did or did not actually occur.

The defendant's main argument concerning the evidentiary significance of the missing surveillance camera footage – that it would show that there were other members of the public around at the time of the alleged incident and, consequently, that the defendant did not "wait[] until no one was around in the community center" before beckoning for the victim to approach – does not pertain to any major issue of dispute at trial. The State did not dispute that there were other individuals present in the Center at the time of the incident. Several witnesses were available to testify, and in fact testified, to the fact that there were many individuals roaming around the Center on the day in question. The missing videotape footage would have been cumulative with their testimony.

Finally, the remaining evidence against the defendant was strong. The victim in this case testified that the defendant committed the crime. Other witnesses testified that the victim's behavior following his encounter with the defendant was consistent with his being in a state of fear and agitation. The victim promptly reported the incident to his friend, his friend's father, and others. Officer Conway testified that, after his arrest, the defendant waived his *Miranda* rights, denied that he had talked to any minors during his time at the Center, and went from being relaxed and talkative with the police to upset and uncooperative after he saw the word "videotape" appearing on the affidavit accompanying his arrest warrant. Considered as a whole, the evidence against the defendant was strong, and we do not believe that the State's failure to preserve the video surveillance footage from all of the cameras in the Center "hindered [the defendant] in the full and complete exposition of his theory to the jury." *Id.* Rather, we conclude "that he experienced no measurable disadvantage because of the unavailability of the videotaped evidence." *Id.* The judgment of the trial court concerning this issue is affirmed.

**III.**

-16-

The defendant claims that the trial court erred by allowing the admission of selected surveillance camera footage that was preserved by the police on DVDs from two of the Center's surveillance cameras. The defendant claims that the State violated the defendant's due process rights by admitting the footage from these DVDs because it was (1) misleading, in that it showed skips, jumps, and freezes, and (2) not identical to the original video surveillance footage because testimony at trial established that the original footage did not contain skips, jumps, or freezes. However, these claims have been waived.

In the court below, the defendant filed both a motion for a new trial, pursuant to Tennessee Rule of Criminal Procedure 33, and a motion for a judgment of acquittal, pursuant to Tennessee Rule of Criminal Procedure 29. Each motion incorporated the arguments made in the other by reference. In neither motion, however, did the defendant challenge the trial court's decision to admit the DVDs containing the selected surveillance camera footage. As a result, the defendant has waived this issue. T.R.A.P. Rule 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). His claim is denied accordingly.

## IV.

The defendant's last challenge to his conviction is that Tennessee Code Annotated section 39-13-528(a) is void for vagueness and unconstitutional both on its face and as applied to him. The defendant argues that the statute at issue violates his rights under the First, Fifth, and Fourteenth amendments of the United States Constitution and their state counterparts, because the statute does not provide him with fair notice as to what conduct is prohibited by the statute. Moreover, the defendant argues that the statute at issue purports to cover words that are merely distasteful and socially inappropriate and that both the federal and state constitutions protect his right to utter those words. We conclude that these claims are without merit.

A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct. *See Rowan v. United States Post Office Dep't.*, 397 U.S. 728, 740 (U.S. 1970) (citing *United States v. Cardiff*, 344 U.S. 174, 176 (1952)). The key question for constitutional vagueness purposes is whether the statute at issue gives persons of ordinary intelligence fair notice as to what conduct is prohibited by the statute. *See Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). We believe that section 39-13-528(a) provides sufficient notice to the defendant as to what conduct is prohibited. It prohibits the defendant from inviting or attempting to induce a minor into committing a sex crime. The Due Process Clause does not require

-17-

Tennessee's solicitation statute to specify every possible set of words or phrases that might constitute such a solicitation – an impossible task indeed. It is enough that the statute places defendants on notice that they may not use any language with a minor that is intended to accomplish the specified unlawful purpose.

The defendant directs our attention *U.S. v. Skilling*, 130 S.Ct. 2896, 2933 (2010), in which the U.S. Supreme Court provided a limiting construction to the term "honest services" as used in 18 United States Code section 1346 (which defined criminal wire fraud as "includ[ing] a scheme or artifice to deprive another of the intangible right of honest services") in order to avoid having to strike the statute down as unconstitutionally vague. The clear implication to be drawn from the Court's ruling was that, absent a construction limiting the statute's terms to bribery and kickback schemes, "the phrase 'the intangible right of honest services'" did "not adequately define what behavior it bars." *Skilling,* 130 S.Ct. at 2928 (quoting 18 U.S.C. §1346). In this case, however, the statute's *mens rea* requirement specifically limits application of the statute's terms to situations that are understandable to an ordinary layman. "Although the physical acts [that may violate the statute] are broadly defined, the culpable mental states necessary to commit the offense sufficiently clarify the statute and narrow its application." *State v. Forbes*, 918 S.W.2d 431, 448 (Tenn. Crim. App. 1995). If the defendant had merely used the words "blow job" in a sentence without the intent to invite, induce, command, *etc.,* a minor into committing actions that would constitute a covered sex crime if they were completed, his conduct would not come under the ambit of the statute. Persons of ordinary intelligence can easily understand what is prohibited by the statute – broadly speaking, any conversation or activity of any sort with a minor that is intended to promote, incite or encourage the minor to engage in sexual activity. Consequently, the statute is not so vague as to violate the Due Process Clause.

Nor is the statute unconstitutionally overbroad. "The constitutional test for overbreadth is whether the statute's language overreaches unlawful conduct and encompasses activity that is constitutionally protected." *State v. Pickett*, 211 S.W.3d 696, 702 (Tenn. 2007). With respect to the defendant's First Amendment argument, however, we agree with the State that while the United States and Tennessee Constitutions may protect the defendant's right to use the words "blow job," it does not protect his right to proposition a thirteen-year-old boy. The defendant attempts to equate section 39-13-528(a)'s prohibition on solicitation to commit aggravated statutory rape to the federal Child Pornography Prevention Act of 1996, which was struck down by the U.S. Supreme Court in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 256 (U.S. 2002). However, in making this analogy, the defendant overlooks the clear affirmation in that case that "Congress may pass valid laws to protect children from abuse," as well as the Court's reaffirmation of the longstanding principle that the states may ban possession of pornography produced using children because of their "interest in preventing child pornography from being used as an aid in the solicitation

of minors," as well as their interest in preventing further victimization of the participants for whom the video effectively serves as a "record of [their] sexual abuse. *Id.* at 245, 250. The *Free Speech Coalition* Court struck down the statute at issue as unconstitutionally broad because it criminalized "virtual child pornography" – and other forms of pornography made entirely by consenting adults – "simply because it may fall into the hands of children." *Id.* at 252. The Court explained that the ban at issue was not narrowly drawn because it did not only prohibit illegal conduct but also went "well beyond that interest by restricting the speech available to law-abiding adults." *Id.* at 252-53. In contrast, our state supreme court upheld a similar child pornography law against an overbreadth challenge in *State v. Pickett* on grounds that, in that case, "the plain language [the statute at issue] require[d] that the image be of 'a minor.'" 211 S.W.3d at 703 (quoting T.C.A. § 39-17-1003(a) (2003)). Because Tennessee's section 1003(a) did not prohibit the possession of material that "appears to be" of a minor, and it was the "'appears to be' language [that] rendered the statute [at issue in *Free Speech Coalition*] unconstitutionally overbroad," the Tennessee supreme court concluded that the statue at issue did not encompass "constitutionally protected speech." *Id.*

Likewise, section 39-13-528(a) does not criminalize any constitutionally protected speech. The statute does not criminalize, and the defendant's crime did not involve, speech intended to occur between two consenting adults. As the *Free Speech Coalition* Court made clear, the longstanding principle of *Brandenburg v. Ohio* that "[t]he government may suppress speech . . . advocating . . . a violation of law . . . if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action'" remains intact. *Id.* at 253 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969)). The *Free Speech Coalition* Court took great pains to stress that "[t]here is here no attempt, incitement, *solicitation*, or conspiracy," to commit child sexual abuse. *Id.* at 253 (emphasis added). In the case at bar, however, solicitation to commit child sexual abuse is precisely what is prohibited by section 39-13-528(a). The statute's terms are not overly broad in their attempt to prohibit the sexual solicitation of children; its express terms confine it precisely to that purpose. Consequently, the defendant's overbreadth challenge to section 39-13-528(a) is denied.

**V.**

Finally, the defendant challenges a 2008 change to Tennessee's work release program that rendered "person[s] convicted of a sexual offense or violent sexual offense" ineligible for work release. T.C.A. § 40-35-213. Because this change in the law governing work release eligibility occurred after the defendant committed his crime, the defendant urges that the new law violates the *Ex Post Facto* Clause because it "changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed." *State v. Pearson*, 858 S.W.2d 879, 882 (Tenn. 1993). While the *Ex Post Facto* Clause generally prohibits the states

from passing laws that affect the "standard of punishment applicable to crimes that have already been committed," it does not "forbid[] any legislative change that has any conceivable risk of affecting a prisoner's punishment." *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506, 508 (U.S. 1995). More specifically, the Clause does not require courts to "invalidate any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement." *Id.* at 508. "[T]he question of what legislative adjustments 'will be held to be of sufficient moment to transgress the Constitutional prohibition' must be a matter of 'degree.'" *Id.* at 509 (quoting *Beazell v. Ohio*, 269 U.S. 167, 171 (1925)).

The legislative change at issue here has not impacted the prisoner's expected term of confinement in any way. Solicitation of a minor to commit the offense at issue was a Class E felony at the time the defendant committed his offense and remains so to this day. *See* T.C.A. § 39-39-528(c) (2007 & 2011); T.C.A. § 39-13-506(c) (2007 & 2011). The sentencing range for a Range I offender committing a Class E felony was, and remains, between one and two years. *See* T.C.A. § 40-35-112(a)(5) (2007 & 2011). The actual sentence the defendant received was, and remains, two years, with 120 days of that sentence being spent in confinement in the county jail and the remaining time spent on probation with community corrections as a condition of that probation. In short, the legislation has had no impact on the defendant's expected term of confinement.

The legislative change at issue affects only one possible aspect of the 120 days that the defendant has been ordered to spend in jail: the possibility that he might be able to serve some or all of those days performing work outside the jail during the daytime hours. However, "work release is not a fundamental right." *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994). While work release has been referred to as an "alternative sentence," T.C.A. § 40-35-104(c)(7), and a "form of probation," *see, e.g., State v. Lowe*, 661 S.W.3d 701, 703 (Tenn. Crim. App. 1983), this court has clarified more recently that "work release is not probation" but, rather, a form of "incarceration," because it "occurs when a defendant, who is serving a sentence of confinement, is temporarily released from confinement and must report back to jail each day" and eligibility is "governed by either the administrative authority of the jail or the sentencing court." *State v. Terrance Dwain Norton*, No. M2004-02791-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1170, at **6-7 (Tenn. Crim. App. Nov. 7, 2005). While attaching various conditions to a particular defendant's work release eligibility, or denying it altogether, may be onerous, "incarceration by its nature is intended to be punitive." *Id.* at *7.

In this case, the 2008 amendment passed by the legislature reflects only the State's decision to end early community contact for individuals committing specified sex crimes. The decision to deny the defendant the potential privilege of working outside of the prison during

-20-

some or all of his jail time confinement is a regulatory issue. While ending the defendant's eligibility for work release, like ending any other privilege a prisoner may have previously enjoyed during his jail time, doubtlessly makes the time that a prisoner serves in confinement less pleasant, alterations to work release and furlough programs have generally not been deemed by courts to unconstitutionally change or inflict greater punishment on prisoners. *See, e.g., Lee v. Governor of New York*, 87 F.3d 55, 59-60 (2d Cir. 1996); *Milhouse v. Levi*, 548 F.2d 357, 364 (D.C. Cir. 1976). Consequently, the defendant's claim that section 40-35-213 (2008) violates the *Ex Post Facto* Clause is denied.
.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.


_____

JOHN EVERETT WILLIAMS, JUDGE